Henry F. Werker, J.
These are actions for permanent injunctions brought by the plaintiffs 'against the defendants upon different grounds but arising out of the same set of facts. Upon motion of the plaintiff, the County of Sullivan, the cases were tried jointly, hut not consolidated.
Plaintiff, the County of Sullivan (hereinafter called the “ county ”) commenced its action by service of a summons and complaint on July 2, 1970, and on July 3, 1970, obtained an order to show cause and a preliminary injunction, and the plaintiff, Commissioner of Health (hereinafter called the “ Commissioner ”) commenced his action by service of a summons and complaint and order to show cause on July 9, 1970 containing a preliminary injunction both pending a decision at a Special Term of this court to be held on July 10, 1970. An order continuing the temporary injunction pending the trial of the actions was signed by Honorable Bussell G. Hunt, Justice of the Supreme Court, dated July 17,1970. Justice Hunt’s order provided that if an immediate trial was desired by either party, it would be scheduled for July 28, 1970, hut that notice to that effect was to he served upon him before July 20, 1970. Plaintiff county served such a notice within the time limited. The defendants on July 24, 1970, obtained an order to show cause from the Honorable Michael El. Sweeney, Associate Justice of the Appellate Division, Third Department, returnable on August 3, 1970, wherein they applied for an order vacating or limiting the preliminary injunction and staying the immediate trial pending appeal from the order of Justice Hunt. This application was denied by decision of the Appellate Division, Third Department dated August 10, 1970 upon which an order was entered on August 19, 1970. The trial commenced on August 19, 1970, at 10 o’clock. Defendants, who had served *537 and filed a demand for a jury trial, waived the same in open court. The timetable upon which this case was brought to trial, while not essential to its resolution, furnishes justification for the length of the trial (22 days) as well as the liberal rulings with respect to the breadth and depth of inquiry and the subsequent amendment of pleadings to conform to proof "permitted to all parties since none of them had an opportunity for examinations before trial or discovery and inspection before the actual trial.
These cases arise out of the following facts and circumstances : In April, 1970 defendant, Budd Filippo, who is a theatrical producer and promoter, through a friend, approached Mr. Seymour Krieger, an attorney in Woodridge, New York, for the purpose of discussing the possibility of acquiring a site for the purpose of holding a so-called rock festival. The result of the initial meeting was to the effect that the town probably would not be receptive to a rock festival, but probably would be interested in a project which would involve not only rock but also classical programs, drama, musical comedy, jazz concerts and film festivals. This apparently was acceptable to Mr. Filippo who subsequently purchased through Orwell Ventures, Inc., (hereinafter called Orwell) a corporation of which he is the president, approximately 600 acres of land during early June, 1970, near the hamlet of Mountaindale in the Town of Fallsburg, Sullivan County. These transactions were completed with the assistance of Catskill Brokers, Inc. which took Mr. Filippo to the site. One property is improved by a resort hotel and outbuildings. All purchases were arranged by cash down payments and purchase-money mortgages. The total purchase prices were $156,000 and the amount of the mortgages in the aggregate $106,000. Orwell was originally incorporated on March 30, 1970, as Orwell Festivals, Inc. The name was changed on June 3, 1970, at a time when Mr. Filippo had committed Orwell to this project. This change has significance in the light of the definitions given by Mr. Filippo of a festival and concert which incidentally are in accord with Webster’s Third New International Dictionary Unabridged which defines a festival as follows:
‘ ‘ A program of cultural events consisting typically of a series of performances of works in the arts sometimes devoted to a single artist or a particular genre and often held annually for a period of several days or weeks ” (p. 841)
and a concert:
“a: a musical performance of some length by several voices or instruments or both * * * b: a public entertainment *538 * * * made up of a number of short compositions or episodes not joined in an integrated whole ” (p. 470).
Orwell acquired rights of way over adjacent properties for travel to and from parking fields and executed leases with options to purchase with respect to other properties.
One property which was to be purchased is in litigation (Diamond). At the same time Orwell hired Stagg Construction-Co. of Westchester County as a general contractor. Construction was started sometime in the latter part of May, or early June, 1970. The plans for the project were made public sometime during May at a public meeting. A short time after Mr. Filippo met Mr. Krieger, he met Mr. Mortimer Michaels, Supervisor of the Town of Fallsburg, Sullivan County, and as such a member of the County Board of Supervisors. Mr. Michaels is a well-respected citizen, a former chairman of the County Board of Supervisors who has spent 31 years in service as Supervisor of the Town of Fallsburg. Thereafter meetings were held between Krieger, Michaels, Filippo and the other members of the Town Board of the Town of Fallsburg as a result of which the Town Board invited Filippo and Orwell Ventures, Inc., to come into the Town of Fallsburg on May 22, 1970.
Orwell, at sometime before the application for a permit or the issuance of the permit, paid to the Town of Fallsburg $5,000 for additional equipment for the Town of Fallsburg Police Department. A promise of an additional $5,000 was made for the purposé of hiring additional special police on the nights when the rock concerts were to take place. In the meantime petitions were filed with the County Board of Supervisors requesting them to enact legislation which would prohibit the rock festivals without a permit from the county. When it became apparent that there was substantial opposition from other areas of the county, the Town Board of Fallsburg proposed and passed a Local Law No. 1 for 1970 which authorizes mass gatherings upon the presentation of certain plans and information and the issuance of a permit by the Town Board. Specifically, at a meeting of the Town Board held on June 12, the clerk was authorized to set, up a hearing with respect to the Local Law No. 1 on June 23, 1970. This notice was published in two newspapers on June 16 and 18, 1970. The hearing was held on the published date. On that date and immediately after the hearing, the Local Law No. 1 of the Town of Fallsburg was passed. It was filed with the Secretary of State on June 29, 1970, and Audit and Control on June 26, 1970. The vote was recorded by ‘ ‘ Ayes ’ ’, one member of the Town Board (Buffa) being absent. This Local Law was *539 designed to take the Town of Fallsburg out of the operation of the proposed County Local Law No. 1 which had been tabled temporarily but which by its terms would not apply to a town which had a local law for the regulation of mass gatherings. After a public hearing was held with respect to the County of Sullivan’s Local Law No. 1, it was passed on June 29, 1970, and filed with the Secretary of State and Audit and Control on July 6, 1970. On the same night the Local Law was passed, the County Attorney was authorized to commence an action to restrain the defendants from holding any performances at the site.
Conferences were held with the Senior Sanitary Engineer of the State Department of Health at the site and at his office. The defendant Orwell made an application to the New York State Labor Department for approval of its plans for the site which were disapproved. An appeal to the Board of Standards and Appeals is now pending regarding certain variations. The State Health Department through its District Health Officer, Michael J. Lipari, M. D., asserted jurisdiction over the project under the mass gatherings sections of part 7 (as amd. May 12, 1970) of the Sanitary Code of the State of New York (10 NYCBR Part 7) and so informed Budd Filippo as president of Orwell by telegram and letter dated June 25, 1970. Orwell denied jurisdiction of the Health Department under part 7 and failed and refused to file an application for a permit under that part of the Sanitary Code.
Orwell had filed an application for a- permit with the Town of Fallsburg for a gathering of 50,000 persons and four rock festivals at the site in Mountaindale, Town of Fallsburg, Sullivan County.
The application was made by petition verified on June 30, 1970, and expressly reserved Orwell’s rights to contest the validity of the Town of Fallsburg’s Local Law No. 1 for 1970. A permit was issued to Orwell on June 30, 1970. After these actions were commenced.and on July 17, 1970, Orwell filed an amendment of its application for a permit under Fallsburg’s Local Law representing that it would limit its advertising to a 150-mile radius from the site, its ticket sales to 25,000 per rock performance and would conduct programs not in excess of 5% hours. On July 20, 19701, the Sanitary Engineer of the Monticello Subdistrict Office of the Department of Health acknowledged receipt from Orwell’s engineer of plans for sewage and water but held the submission in abeyance pending an application for a permit to hold a mass gathering under part 7 of the Sanitary Code. It has been acknowledged by the State *540 Health department that the plans for sewage were approvable but the plans for water were not.
The publication of details with respect to the programs proposed and the action to be commenced by the County of Sullivan and the enactment of the County’s Local Law caused a public furor and raised with many the specter of another “Woodstock ” festival which was held in the Town of Bethel in Sullivan County on August 15, 16, 17 of 1969. The evidence indicates that that festival was attended by an estimated 400,000 people, caused complete traffic congestion, inconvenience and discomfort to the residents of the Town of Bethel and other towns in the county and resulted in a breakdown of public morality and law enforcement at the site where it was estimated that some 200,000 people were in attendance. The health services of the county were impossibly overburdened as were all other services. According to the World Almanac for 1970 (p. 2-63), there are only 30 cities in the United States which have a population of 400,000 people. The people who attended Bethel were without food, shelter, adequate medical services, sewage or refuse disposal, -and adequate parking facilities. The highways adjoining the site were inadequate to carry the traffic load to which they were subjected. While there are great dissimilarities between the program proposed by the defendants and that at Bethel — principally the variety, length of the program and the preparations of the site — there are, nevertheless, sufficient similarities to point out clear and definite dangers to the health, welfare and safety of the public including those attending such festivals. More recently, a proposed festival at Powder Ridge in the State of Connecticut produced 30,000 people- after the program had been enjoined. This too resulted in a traffic jam and a deterioration in public morality. The fact that Bethel resulted in only 109 arrests and 2 deaths over the period of 7 days during which the persons were arriving at the site, attending the festival and leaving it, is not indicative of the number of crimes and other violations of law which were taking place. It is indicative of a restraint imposed upon the law enforcement authorities for fear of a major incident which would endanger the persons and property of many innocent people. Restraint imposed by fear of this type is intolerable in a free society. It bears with it the seed of complete deterioration of organized society and the civil liberties of every individual. Mountaindale like Bethel was advertised as a mass gathering of persons. It also was to be held in an open field without shelter for those attending. The advertising carried in The New York Times and other newspapers by the promoters *541 of Mountaindale was obviously provocative and designed to give the impression that a repeat performance of Woodstock was in the making. The advertising stated, “ Summer youth capítol of the east * * * a combination Woodstock, Provincetown, Tanglewood and Greenwich Village.”
The hamlet of Mountaindale is located in the northeastern section of the County of Sullivan and in the Town of Fallsburg. The Town of Fallsburg is a first class town having a permanent population of approximately 6,800 persons. It is a resort town and its summer population increases to 80-100 thousand. It is a very progressive town having established 30 special districts concerned with the health, safety and welfare of its citizens including parks, water, fire, lighting and sewer districts. It has an organized police department employing 19 policemen and a sanitary landfill operation for solid wastes. It also maintains its own gravel and asphalt plants and manufactures its own stone and sand. It has adopted a Zoning Ordinance, a Noise Ordinance and the New York State Building Construction Code, but the town has no hospital facilities of its own.
Mountaindale has a permanent population of between 800-900. Mr. Michaels who lived in the community from 1914 to 1938 testified that the hamlet at one time had been a thriving community but with the elimination of the Ontario and Western Railroad, it had declined. Its resort hotels had fallen into disrepair and the area now gives the impression of being more rural with but a few camps and cottage colonies.
The proposed site is located on County Road 54 between Park Hill Road and Post Hill Road. The performance area was visited on foot by the court, the parties and counsel. The roads in the area were similarly inspected by automobile. The area approach to the site is bounded by State highways — on the north by Route 52, on the west by Route 42, on the south by Route 17 (a 4-lane highway), and on the east by Route 209. The interior of this area is served by County Road 57 and 56 running north from Route 17 to County Road 54; County Road 53 running easterly from Route 42; and County Road 55 running westerly from Route 209. Some of these county roads traverse more than one town. There are also town roads leading off the county roads and the State highways, the two nearest the site being the Park Hill and Post Hill Roads. The Ontario and Western Railroad right of way has been cleared and graded by the town and runs parallel to County Road 53 and 54 to the site and was to be used as an emergency vehicle roadway. Permission for its use as such was never obtained from the owners thereof. The original advertising made no *542 mention of any State route excepting Route 17 and exits 109 to 112 on Route 17. These exits, it is estimated, could permit a flow of 1,200 cars per hour under ideal circumstances. The expert traffic engineer who testified for the defendants indicated that while the site was useable for the purpose intended, the traffic plan submitted by him would need a great deal of work before it would be operable. Parking spaces which would house an estimated 1,500 cars are located on a town road south of the site; 3,000 cars west- and northerly of the site on a town road and another area of 1,025 and 2,375, respectively, northeasterly of the site on town roads. These are fields some of which have been mowed and graveled driveways laid down in them with parking to be had in the grass strips between. They are well drained; however, the entrances to them from the roadways are rough. The roads leading to the site are anywhere from 16 to 22 feet in width without uniform shoulders of any dimension. Although the defendants requested the County Highway Superintendent to clear the brush from the county roads, this has not been done. The site is approximately 5 miles from the town line of the Town of Thompson on the south, 2 miles from the Town of Mamakating to the east and 3 miles to the Ulster County line and the Town of Wawarsing on the north. It was planned that persons attending would park in the fields and walk to the site over paths from which the brush would have been removed. These paths over leased lands were anywhere from % of a mile to 1 mile in length. In most instances they would have been uphill. Based upon the recognized fact that it takes 12 minutes to walk one mile under ideal circumstances, it probably would take a person double that amount of time to traverse these paths in the daytime and, considering conditions in the summer time and at dark, a considerable period longer than that. The site itself is an enclosed field of approximately 11 acres, or 525,000 square feet. The plans of defendant submitted to the Labor Department indicated that the crowd estimate for the enclosure was 50,000 and the maximum capacity 100,000 people. The Labor Department Guidelines for mass gatherings suggests an allowance of 50 square feet per person. These allowances were made based upon a gathering lasting for more than 24 hours and, in the opinion of this court would be inapplicable to gatherings for a lesser period. The total area of the Saratoga Performing Arts Center is 15 acres. The audience area is 5 acres. For purposes of comparison these figures are significant. The present performance site itself is bowl shaped focused upon a stage which has been erected at the *543 bottom of the hills surrounding it. The enclosure consists of a sturdy fence mounted on 4-inch by 6-inch poles with 2-inch by 4-inch frames and covered with two 4 foot by 8 foot panels of plywood set horizontally. There are sufficient exits in the fence to accommodate the crowd of 25,000 requested in the amended permit. There are no seating arrangements. Bark has been scattered over the bare ground, and it was anticipated that the persons attending would sit on the ground. Banks of privies numbering 250 in all have been installed. These have enamel seats with conical galvanized sheet metal shutes which lead directly into a sewer pipe through which water would continuously flow and which would be flushed at 15 minute intervals. The galvanized sheet metal shutes which take the place of the vitreous china bowls found in the usual toilet were according to the promoters to be flushed down by hose at intervals, permitted to dry and then be restored to service. Hose connections for this purpose were available. Bubbler drinking fountains and outdoor lavatories have also been installed. As of the time of the original complaints, none of these installations were completed. During the interim, some were completed to such an extent that conceivably a mass gathering on a trial basis could have been attempted. The water system is not approved and not approvable because the filtering system and backwash is not acceptable. Furthermore, defendants did not apply to the Conservation Department of the State of New York for a permit to build a reservoir in Braden Brook until after the reservoir had been dug with the resultant silting of downstream and Sandburg Creek into which this brook flows. In addition there is no water storage which means that at the rate of 1 pint per hour per person, the water supplied by direct flow might be exhausted at some point. Food service to the area would be by trailer brought in by a vendor approved by the Health Department. The solid waste disposal system through a local refuse organization would also be approvable by the Health Department if defendants had sufficient trash receptacles. Medical facilities were limited to two trailers equipped to take care of minor surgical and first aid cases and tents for hospitalization. The plan as to personnel was not specific as to the names and qualifications of employees. The doctor who was to organize this at the outset called upon the Civil Defense Medical Officer to enlist his aid. That Medical Officer, as a result of the Woodstock Festival, testified that he did not believe that the county medical facilities could bear the burden of another Woodstock nor would the physicians volunteer as they had at that festival. He also *544 testified that all supplies of tetanus injections in Sullivan, Ulster and Orange Counties were exhausted during the course of that festival and that an emergency hospital was set up to take care of injuries and drug cases. No camping facilities are available at the Mountaindale site, although weekend campouts were advertised.
The Mountaindale site is located within a zoning district known as a resort district under the Town of Fallsburg’s Zoning Law. The use to which defendants intended to put the land is a permitted use (§ 700.4). Section 1413 (subd. [2]) provides that for amusement facilities one parking space must be provided for each 5 customers on the basis of maximum servicing capacity. It also provides that the Board of Appeals may permit other off street parking provided it lies within 400 feet of main entrance of principal use (§ 1413, subd. [1], par. [b]) and that parking spaces shall be paved in a manner adequate to eliminate dust and mud problems and that plans for such spaces shall be submitted at the time an application for a building permit is filed. No evidence was introduced by defendants that an application for a building permit was ever filed with the Town of Fallsburg, nor was any evidence introduced indicating that an application for a permit under the ordinance controlling noise in the Town of Fallsburg was made by the defendants.
Traffic experts were called by the plaintiffs. They testified in substance that the road network surrounding the site all led into one road, namely, County Roads 54 and 55". The maximum number of cars which could be gotten to the site under ideal conditions, i.e., no breakdowns, flat tires or accidents, at the rate of speed of from 15 to 20 miles per hour and with traffic controls in the person of police radio communication, etc. would be 1,000 per hour; that under comfortable conditions, this number would be reduced to approximately 300 to 400 per hour and that if it exceeded 400 per hour, congestion would develop. It was conceded that part of the key to the problem was proper traffic control by way of police, signs and radio communications to eliminate tie-ups, but it was also conceded that how fast cars could get into the parking fields and the presence of adequate personnel to guide parking would also play a part in moving traffic off the highways. Three attendants at the fields were said to be the minimum required to do the job of parking the ears properly. As to traffic control, the Town of Fallsburg was prepared to hire 50 special policemen |or this and other duties. Internal security was to be handled by the promoters and the evidence is that 100 security people were authorized but no written plan as to what internal security arrangements were *545 to be made was ever submitted to anyone. At least two security chiefs were hired but let go, the last on July 6 or 7, 1970. Major Monahan of the New York State Police Troop F testified that the normal complement of 50' men was increased to 350 to handle Woodstock and was inadequate. He estimated that the plans for Mountaindale which his staff had prepared would require a force of anywhere from 80 to 300 depending upon the assignments. The Sheriff of Sullivan County testified that he had a force of 356 uniformed deputies at Woodstock from all over the State who were used principally for traffic control. The assignment of these officers disrupted the police enforcement capabilities in those areas from which they came.
The original program of the promoters consisted of night performances:
6 or 7 weeks of Broadway theatre five nights per week
3 rock concerts lasting from noon until sunrise the following day or 18 hours July 11, August 1, August 15
4 classical concerts
1 jazz concert lasting from 2:00 p.m. until 2:00 a.m. August 8
1 Israeli festival to last 12 hours August 13
2 film festivals; dusk to dawn by the car load August 3 and 8
1 choreo concert
It is to be noted that all the ‘1 rock ’ ’ concerts were to be held on Saturday into Sunday. The court has taken judicial notice of the fact that traffic congestion is at its worst during these two days.
The amended program consisted of:
5 rock concerts of 5% hours
1 Israeli festival to last 2% hours
1 choreo concert to last 2 hours
2 classical concerts to last 2 hours
Orwell’s records do not disclose the source of the funds which have been invested in this project although it is claimed by defendants that $132,000 has been expended for construction costs and $150,000 is outstanding in obligations. A lien has been filed in the amount of $191,000 by Ecco, Inc. MartiiV Dell, who is secretary and treasurer and a director of Orwell Ventures, Inc., testified that he had collected approximately $250,000 from investors who remained nameless; yet there was no explanation for the discrepancy between the funds expended and those collected. The accountant retained by the Health Commissioner indicated that he could find canceled checks for only approximately $22,000 of the estimated $132,000 for construction costs. He also testified that he could form no opinion as to the assets and liabilities of Orwell because its records were not complete. *546 The total deposited in the corporate accounts was $255,000, the total disbursed $253,851. Upon the application to the Town of Fallsburg for a permit, the corporation represented that it had two stockholders, Mrs. Dell and Mrs. Filippo; yet the corporate stock record and stock certificate book are barren as to their ownership. Indeed the book is barren of any record except the receipt from the 'Secretary of State and the authorization to the Chemical Bank to open an account. There are no minutes of incorporators, stockholders or directors. Mr. Dell further testified that he sold prospective investors on two plans:
First, they were to invest $5,000 for 1 share and to receive their money back and a 1% interest in net profits;
Second, they were to invest whatever moneys they could and would receive their money hack plus 1% of the net profits. Several investing units would have been entitled to more than 5% of the shares.
The shares were to be issued when the programs began to run. On the basis of the number of investors, 40% of the stock would have been issued to them and Mrs. Dell and Mrs. Filippo would have retained 60%. The investors would have received 64% of the net profits and Mrs. Dell and Mrs. Filippo 36% of the net profits for their 60% stock interest. The interest in net profits was to continue as long as the programs continued. Mr. Dell further testified that he had made a memorandum of the persons who invested and had shown it to Mr. Filippo but that it had been lost. Mr. Filippo denied knowing who the investors were. Mr. Dell had great difficulty reconstructing the list and admitted that if anything happened to him, the investors would have to come forward and be identified since no one knew them and he had given no receipt to them for their moneys. Many of the investors had invested .sums of upwards of $50,000. It is the impression of this court that the testimony of Mr. Dell was not the frank disclosure which his oath required. His apparent attempts to avoid testifying further reinforces this impression as does the fact that he has three times been convicted of crimes in the State of New York under the name Morris Yudelowitz, the latest conviction being in 1960 for grand larceny. Mr. Dell further testified with respect to the corporate ticket account that the list of names of persons to whom cash returns on tickets were made was lost. Some of the moneys received for tickets were furthermore deposited in other than the ticket account, but the record thereof was lost. It would appear that there may be violations of the General Business Law (art. 26-A) dealing with theatrical financing with respect to the so-called sale of shares as well as the maintenance of the ticket accounts, It *547 further appears from the testimony of Mr. Filippo that although a permit was issued for the sale of 50,000 tickets and an amended permit for 25,000 tickets, the corporation had embarked on a ticket sale program in the first instance by which the number would not be limited and in the second instance would sell the 25,000 and as many more as they could. Although the defendants were repeatedly directed by the court to produce all of their books and records with respect to the Mountaindale project, the records were produced piecemeal over the course of the trial and the court is convinced that not all of the records were produced. A conflict in testimony of Mr. Filippo and Mr. Dell as to responsibility for the financial operations of Orwell Ventures has also appeared in the record since Mr. Filippo referred all matter of this nature to Mr. Dell and Mr. Dell said that he signed what he was asked to sign. Again the court attributes this to a lack of the candor which an oath requires and a design to frustrate the judicial process. The good intentions expressed by both witnesses are belied by this attitude as well as the misrepresentations made to the Town Board of the Town of Falls-burg with respect to ticket sales and stock ownership in the verified petition filed under Local Law No. 1 of that town.
Orwell Ventures, Inc., has a proposed budget for the year 1971 which they indicate would require an expenditure of $195,000 for each of 4 rock concerts upon which they would realize $250,000 if they sold 25,000 tickets at $10 per admission. The rock programs would carry the cost of the classical programs and complete construction. The dramatic programs would pay for themselves. In addition it is anticipated that they would realize $25,000 per night from concessions for food etc.
Manheim Fox who was the producer for Orwell testified that the age group to be served by the rock concerts was between 16-35; that there was no reason why a rock concert of 3 hours’ duration would not be economically successful. He has an interest in the profits made by Orwell but was an independent contractor not an employee. The programs proposed by Orwell were set up by him.
Several persons, among them Mr. Max Yasgur and Kenneth R. Van Loan, testified that they had no difficulty with traffic or getting deliveries during the course of the Woodstock festival. Mr. Yasgur ran six milk routes during this period. He had delays but his men got to work and made deliveries. Mr. Van Loan got to work each day and got deliveries of gas to his station. Mr. Joyner, the Postmaster in Bethel, testified to the fact that there were no mail deliveries and. that he closed the post office during the festival. He also testified as to damage to the *548 White Lake Presbyterian Church and his patio as well as to immoral acts which he observed and the refuse along the roads leading to the festival. There were many isolated acts of vandalism upon private properties. There can be no question that the lives of the residents of the immediate area of the Woodstock site and those of many people in and out of the county who were called upon to render gratuitous services were materially disrupted and their comfort and convenience interfered with.
The cleanup costs — town, county and State — after that festival amounted to less than $15,000. • These were apportioned costs meaning that they were attributed to the crews doing this work rather than their normal highway repair and maintenance activities. There were no additional expenditures at any level, with respect to cleanup involving overtime.
The manager of the Saratoga Performing Arts Center testified that the center holds rock concerts. These run for a normal performance time of approximately 3 hours. Until 1970 the largest audience was 17,000. Newspaper accounts in 1970 indicated that audiences of 19,000 and something in excess of 20,000 were in attendance for groups called the Fifth Dimension and Chicago. The Arts Center is served by 4-lane highways. There are adequate parking facilities and attendants and lighting all over the performance site. Again the dissimilarities between that type of operation and Woodstock are plain but the fact that rock performances can take place without immorality, drugs and inconvenience to others indicates something of the limits within which such performances must be confined.
At the end of the county’s and the Commissioner’s cases, counsel moved to amend their respective pleadings to conform to the proof subject only to a specification as to misrepresentation by defendants which would be added upon rebuttal. These motions were granted over objection by counsel for the defendants in order to hear the issues which arose in the course of trial and by such determination to eliminate a multiplicity of actions based upon those issues upon condition that defendants would be permitted to amend their pleadings so as to set up as an additional defense the amended application and amended permit granted by the Town of Fallsburg together with all of the constitutional objections raised with respect to both plaintiffs ’ causes of action and to part 7 of the Sanitary Code of the State of New York. Plaintiffs were both aware of the defendants’ amended application for a permit and the amended permit as early as July 24, 1970 when the application to the Appellate Division was made by defendants to stay the trial of this action. *549 Consequently, surprise was not a factor when at the opening of the trial defendants expressly stated that they were relying upon the amended permit.
Defendants consented to a judgment against them upon the action commenced by the Commissioner with respect to the 50,000-ticket, 18-hour rock concert programs. This judgment was granted to plaintiff commissioner, without costs, reserving to defendants all constitutional objections to part 7 of the Sanitary Code.
For clarity as to the issues involved and the causes of action which each plaintiff intended to rely upon as a result of the amendment of the pleadings to conform to the proof, the court requested that each of the plaintiffs state their claims with respect to the amendments.
The County of Sullivan by its County Attorney stated its amendments in substance as follows:
(a) That the defendants failed and refused to comply with Local Law No. 1 of the ¡County of Sullivan;
(b) That the Town of Fallsburg’s permit and amended permit were improperly issued without making proper investigation which would warrant the issuance of the permits;
(c) That the Town of Fallsburg’s Local Law No. 1 was not properly enacted under the Town Law and the Municipal Home Eule Law and consequently, is a nullity;
(d) That the Town of Fallsburg’s Local Law No. 1 is unconstitutional because it is vague and indefinite;
(e) That the Town of Fallsburg issued the permit based upon false, inaccurate and insufficient information with respect to stock ownership of applicant, its officers and directors and number of tickets to be sold.
Defendants’ answer to these amendments was in effect that the County of Sullivan had no remedy against them for a public nuisance; that the Fallsburg statute could not be challenged unless Fallsburg was a party to this action; that the county had no cause of action to enjoin another municipality from issuing a permit; that Sullivan County’s Local Law (1) does not apply because by its terms it exempts towns which have enacted their own law; (2) is unconstitutional because it does not set standards upon which a permit should be granted; (3) it violates the Equal Protection 'Clause because it discriminates between mass gatherings sponsored by governmental subdivisions and others; (4) because it deprivés defendants of property without due process of law; (5) it imposes through its fee, bond and insurance provisions a tax on free speech and assembly; both Fallsburg and County of Sullivan’s Local Law No. 1 are unconstitutional on ground that they are more strict than the State *550 ' Sanitary Code and because State has pre-empted the field of regulation; and a general denial.
The amendments for the Commissioner of Health which were made by the Assistant Attorney-General were as follows :
That defendants failed to design and construct a water supply for the project in compliance with part 5 of the Sanitary Code; failed to apply or obtain a permit under part 7 of the Sanitary Code for temporary residence and labor camp; failed to obtain approval of the sewage disposal system under article 12 of the Public Health Law; and to properly dispose of backwash under articles 11 and 12 of the Public Health Law; failed to obtain a permit under Public Health Law for refuse disposal and failed and refused to apply for or to obtain permit under part 7 of the Sanitary Code for either the original program or the amended program with respect to mass gatherings.
There was a general denial by the defendants coupled with the constitutional defenses raised by it in their answer to the Commissioner’s original complaint.
Courts do not exist in a vacuum. They traditionally and historically have been concerned with the protection of individual liberty against the encroachment by government or other individuals. They are aware of what is going on in the world about them, and, to a limited extent may take judicial notice thereof. (Matter of Murray v. La Guardia, 291 N. Y. 320, 326, cert. den. 321 U. S. 771; Rowland v. Miller, 139 N. Y. 93, 94; Comereski v. City of Elmira, 283 App. Div. 556, affd. 308 N. Y. 248.)
In the context of the present-day stress between the young and the established society, to which they owe their continued existence, and in the face of repeated social, moral and other abuses, it behooves the court to exercise the patience and understanding which the contestants have lost in the interest of preserving those rights of both parties, or so many of them as may be preserved, without materially disrupting other segments of the community or infringing upon the rights and safety of others. Simplistic indeed is the solution which grants a permanent injunction and thus pragmatically sounds the death knell of rights which may be incapable of being regained. (Eg. Brew v. Town-Mac, Inc., 61 Misc 2d 55; Town of Preble v. Song Mt., Inc., 62 Misc 2d 353.) Solutions which will permit the maximum exercise of individual rights while protecting the public welfare are demanded by our system of justice. These solutions are suggested by principles which have been forged in heat of centuries of struggle for the recognition of individual liberty. Necessity may be the mother of invention, but it is also the father of tyranny. These principles limit the extent to which *551 necessity may Tbe used as an excuse for repression. They form a part of the framework of organized society. Unless we adhere to them and compel the recalcitrant to do so the rule of law will disappear and might shall once more become right.
“ It is a general rule of law that every person may exercise exclusive dominion over his own property and subject it to such uses as best subserve his interests and no other person shall say how he shall use or what he shall do with his property. However, this principle is subordinate to another which finds expression in the familiar maxim * * * that every person may make such use as he will of his own property, provided he uses it in such manner as not to injure others.” (42 N. Y. Jur., Nuisances, § 10.)
There is also an ancient maxim that you may abate only so much of a nuisance as is excessive. “ You can, at the utmost, only abate so much of the thing as is a nuisance. You cannot destroy the whole (which is the right here claimed;), but only so much of the thing as makes it a nuisance.” (Cooper v. Marshall, 1 Burr. [King’s Bench Reports] 259, 267 [1757],)
Equity acting in personam will restrain a threatened or existing nuisance. Prior restraint is a principle in this field because one is not required to stand by while irreparable harm is done. So too in the interest of preventing such harm statutes have been enacted to regulate the use of private and public property (Building and Zoning Ordinances, Traffic Laws, Licensing Laws). Prior restraints upon freedom of the exercise of religion, speech and assembly have been permitted provided they were narrowly .drawn and carefully defined so as to permit no discretion in the permit issuing official. The exercise of such discretion might obviously become the equivalent of an absolute prohibition of the exercise of those rights. (Saia v. New York, 334 U. S. 558, 560-562.) The cases proscribing such regulation are myriad.
The challenge to the county’s standing to bring an action in equity to restrain a threatened nuisance without express statutory authority is without merit. County of Albany v. Hooker (204 N. Y. 1) is not authority to the contrary. It stands for the rule that a municipal corporation has no standing to challenge the enactments of the State insofar as its governmental powers and duties are concerned. (City of Buffalo v. State Bd. of Equalization, 26 A D 2d 213.)
It is now well settled that a municipality may maintain an action in equity to restrain a threatened or existing public nuisance. (New York Trap Rock Corp. v. Town of Clarkstown, 299 N. Y. 77; City of Albany v. McMorran, 34 Misc 2d 304.)
*552 A county is a municipal corporation (County Law, § 3). As such it may sue or be sued (N. Y. Const., art. X, § 4). The limitation upon a county’s liability for injuries on highways or bridges has been removed by statute. (Highway Law, § 139.) Article IX of the New York State Constitution known as the Bill of Bights for Local Grovernments and which became effective on January 1, 1964, included counties within its scope as did the Municipal Home Buie Law which was enacted simultaneously. It is implicit in the Constitution and in that statute that a county has the right to preserve its existence not only by enacting legislation, but also by applying to the courts for relief from activities which in the opinion of its ruling body would endanger the government, protection, order, conduct, safety, health and well being of persons or property therein. The sovereign power of the State has to some extent been delegated to the county by article IX (§2, subd. c, par. [ii], cl. [10]) of the Constitution and the Municipal Home Buie Law (art. 2, § 10, subd. 1, par. [ii], cl. a, subcl. [12] formerly [11]). The county, therefore, has standing to maintain this action. This determination may have been implicit in the decision of the Appellate Division when it denied defendants’ motion to vacate or modify the preliminary injunction and to stay the trial in which event, it would have been the law of this case. Since the conclusion of law was not expressed it was in this court’s opinion better to clarify the county’s status here.
A public nuisance has been variously defined, “ Long ago it was adjudged that one dwelling in a city who with the aid of a speaking trumpet made great noises in the night time to the disturbance of the neighborhood, must answer to the King (Rex v. Smith, [1726] 2 Strange, 704). The precedent is not one to be hastily renounced in days when trumpets have a power unknown to a simpler age (People v. Rubenfeld, 254 N. Y. 245, 248.)
The 1909 Penal Law of the State of New York (§ 1530) defined a 1 ‘ public nuisance ” as “a crime against the order and economy of the state, and consists in unlawfully doing an act, or omitting to perform a duty, which act or omission: 1. Annoys, injures or endangers the comfort, repose, health or safety of any considerable number of persons; or, 2. Offends public decency; or, 3. Unlawfully interferes with, obstructs or tends to obstruct, or renders dangerous for passage, * * * a public park, square, street or highway; or, 4. In any way renders a considerable number of persons insecure in life or the use of property.”
*553 The Revised Penal Law of the State of New York (§ 240.45) defines it:
‘ ‘ By conduct either, unlawful in itself or unreasonable under all the circumstances, he knowingly or recklessly creates or maintains a condition which endangers the safety or health of a considerable number of persons ”.
The reviser’s notes indicate that the “ comfort and repose ” wording was omitted purposely because it resulted in trials more civil than criminal in nature.
Cardozo, Ch. J., in People v. Rubenfeld (supra) defined it: “ Public also is the nuisance committed ‘ in such place and in such manner that the aggregation of private injuries becomes so great and extensive as to constitute a public annoyance and inconvenience, and a wrong against the community, which may be properly the subject of a public prosecution.’ (Wesson v. Washburn Iron Co., 13 Allen, 95, 102.) ”
To be reckoned as “considerable” the number of persons need not be shown to be very great (People v. Rubenfeld, supra, p. 247) and as was said in People v. Kings County Iron Foundry (209 N. Y. 207, 210), “ The travelers on a highway of a sparsely settled country town and those moving along the densely thronged city street are equally a considerable number of persons and an illegal obstruction of a highway in the town and that of a city street are equally public nuisances.” The penal method of abating a nuisance is unsatisfactory because it controls only for a relatively short time. Each case must of necessity rest upon its own facts.
The New York State Constitution also provides in article IX (§2, subd. [d]): “ Except in the case of a transfer of functions under an alternative form of county government, a local government shall not have power to adopt local laws which impair the powers of any other local government. ’ ’
The County of Sullivan in its Local Law No. 1 for the year 1970 expressly excluded from its operation any towns which had enacted laws governing mass gatherings. Therefore, assuming that the mass gathering statute of the Town of Falls-burg is constitutional, the county’s Local Law would not apply to that territory constituting the township when the gathering, its impact, and effect would be restricted to the territory of the town. Of course, the constitutionality of that law has been challenged by the county on the ground that it is so vague and indefinite as to be invalid and that it was not properly enacted under sections 62 and 63 of the Town Law and section 20 of the Municipal Home Rule Law, the logical conclusion being that the *554 permits issued to defendants by reason of the unconstitutionality of Fallsburg’s Local Law No. 1 were a nullity and consequently no defense to the county’s action. The Town of Falls-burg is not a party to this action, although it participated in the trial through its Supervisor on behalf of the defendants. A judgment rendered here will consequently not be binding upon it. However, there is no necessity for reaching the constitutional issues presented since defendants are in court and equity acting in personam can bind them. (4 Pomeroy, Equity Jurisprudence [5th ed.], § 1360, p. 974.) Such a judgment in favor of the county would in no way impair the legislative power of the Town of Fallsburg.
It is the rule in this State that a public nuisance must be established by clear evidence before the preventive remedy will be granted. (Yonkers Board of Health v. Copcutt, 140 N. Y. 12.)
Insofar as the county’s action based upon its powers as conferred by article IX of the Constitution and section 10 of the Municipal Home Buie Law together with the liability imposed upon it by section 139 of the Highway Law this court is of the opinion that the county has established by clear evidence that if the programs planned for July 11 had been permitted to go on, a public nuisance would have resulted with concomitant obstruction of county highways which traverse more than one town; that the public health, safety, well being, comfort and convenience of a considerable number of persons would have been annoyed, injured, and endangered. This court concludes from the evidence that the use of highways, medical facilities and the facilities which defendants would have had ready at that time would have imposed an unreasonable and excessive burden upon the people of the County of Sullivan and constituted a threatened public nuisance irrespective of any guilt or wrongful intent. (Regina v. Clark (No. 2), [1964] 2 Q. B. 315, 321; Lowdens v. Keaveney, [1903] 2 Irish Rep. 82, 89.) Those programs involving a proposed ticket sale of 50,000 and 18% hours of performance are consequently permanently enjoined because such a sale would have involved a degree of inconvenience in excess of what the public, including those resident in the county, those attending the concerts and those visiting the county for other purposes should be called upon to tolerate. With respect to any other part of the proposed programs involving a performance in' excess of 3% hours, including intermission, the defendants are also permanently enjoined for the same reasons. It has become apparent through the testimony of others who have attended festivals that overnight performances of any kind offer opportunities for all kinds of unlawful activity *555 and the inference is plain that these activities, and not the rock music, are the inducement for such mammoth attendances.
Lest the motivation behind these judgments be misunderstood it is this court’s firm belief that the rock, country rock, soul, and other modern types of music have and should have their proper place in the entertainment and amusement of the young and not so young people of this Nation irrespective of their elders’ preferences in this connection. But such recognition that the young should be so accommodated and that any Nation which cannot accommodate them has lost some of its viability does not impair the power and the duty of the court in the public interest to insist that their desires, likes and dislikes be kept in perspective with other and older music and mores which have withstood the test of time and many “ generation gaps
The proof that such programs can be economically and artistically successful is furnished by the testimony of Mr. Manheim Fox producer for the defendants and Mr. Craig Henkenson, manager of the Saratoga Performing Arts Center, witness for the plaintiffs.
The same view is held with respect to the dress or hairstyles of the large number of young people who attend these concerts. As was pointed out by this court when these people were characterized as ‘ ‘ hippies ”, there is no law restricting hairstyles or types of clothing to be worn. Although such styles have resulted in untold prejudicial behavior on the part of many and a polarization of opinion against those affecting them, it should be remembered that long hair and beards have been out of style for only 70 years. Perhaps these affectations of dress and hair are akin to pure speech and protected by the First Amendment as was held in Tinker v. Des Moines School Dist. (393 U. S. 503 [1969] [black armbands protesting the Viet Nam war]). Conduct however, which materially disrupts the lives of others or involves substantial disorder or invasion of the rights of others is not immunized by the constitutional right of free speech.
While it is apparently judicial bad manners for a court of original jurisdiction to meet and deal with constitutional issues this court cannot avoid defendants ’ claim that this action by the county and the enactment of County of Sullivan’s Local Law No. 1 violates the right of free speech and assembly protected by the New York State and the Federal Constitutions. This defense is framed in the language and emotionalism of repression of a particular type of dissent and life style.
There can be no doubt that this action was brought and the county statute enacted for the purpose of restricting and regulating what the majority of the Legislature of the County of *556 Sullivan considered to be a manifest evil. But as was .said in People v. Stover (12 N Y 2d 462, 466): “ if the law would otherwise be held constitutional, it will not be stricken as discriminatory or invalid because of its motivation. (Cf. Town of Hempstead v. Goldblatt, 9 N Y 2d 101, affd. 369 U. S. 590.) ”
The problem here is to determine whether the Local Law violates First Amendment rights or otherwise exceeds the police power vested in the county on the ground that it was enacted without. regard to considerations of public health, safety and welfare.
The Local Law in question prescribes no formula for the censorship or suppression of any particular form of communication. Its purposes and objectives are set forth clearly in the preamble and, generally are for the protection of the health, welfare and safety of inhabitants of the county unrelated to the rights of free speech and assembly.
But even assuming that the impact of the Local Law is to regulate free speech and assembly it is permissible if reasonable. What is reasonable is tested by what is ordinary usage and common experience.
“ Social welfare requires in certain instances, reasonable regulation of freedom of speech which, unrestrained, would produce calamitous or undesirable .results — not only for the locality and public order but also, in the long run for the individual involved. The preservation of order and the prevention of disturbance are of prime importance to the State. As was .said in Cox v. New Hampshire (312 U. S. 569, 574 [Hughes, Ch. J.]: ‘ Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses. The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means pf safeguarding the good order upon which they ultimately depend. The control of travel on the streets of cities is the most familiar illustration of this recognition of social need* ” (People v. Feiner, 300 N. Y. 391, 399-400, per Conway, J.) and “Where a restriction of the use of highways in that relation is designed to promote the public convenience in the interest of all, it cannot be disregarded by the attempted exercise of some civil right which in other circumstances would be entitled to protection. One would not be justified in ignoring the familiar red traffic light because he thought it his religious duty to disobey the municipal command or sought by that means *557 to direct public attention to an announcement of his opinions * * * If a municipality has authority to control the use of its public streets for parades or processions, as it undoubtedly has, it cannot be denied authority to give consideration without unfair discrimination, to time, place and manner in relation to the other proper uses of the streets ” (Cox v. New Hampshire, 312 U. S. 569, 574, 576.)
‘ ‘ There is no basis for saying that freedom and order are not compatible. That would be a decision of desperation. Regulation and suppression are not the same, either in purpose or result, and courts of justice can tell the difference.” (Poulos v. New Hampshire, 345 U. S. 395, 408.)
The evidence adduced indicates that there is a reasonable and rational connection based upon experience between the regulation prepared and the manifest evil or abuse to be regulated. The standard in the Local Law is the comfort and convenience of the public within the boundaries of the county and, with respect to both the action brought and the Local Law enacted this court finds no unreasonable or discriminatory proscription of any of the First Amendment rights, except as hereinafter set forth.
The case of Cox v. New Hampshire (supra) and the language-of the late Chief Justice have found approbation in later declarations by that court. (See Shuttlesworth v. Birmingham, 394 U. S. 147, 155, 156.)
“ Every legislative enactment carries a strong presumption of constitutionality including a rebuttable presumption of the existence of necessary factual support for its provisions (Borden’s Co. v. Baldwin, 293 U. S. 194, 209, 210). If any state of facts, known or to be assumed, justify the law, the court’s power of inquiry ends (United States v. Carolene Products Co., 304 U. S. 144, 154). Questions as to wisdom, need or appropriateness are for the Legislature (Olsen v. Nebraska, 313 U. S. 236, 246). Courts strike down statutes only as a last resort (Matter of Ahern v. South Buffalo Ry. Co., 303 N. Y. 545, 555 affd. 344 U. S. 367) and only when unconstitutionality is shown beyond a reasonable doubt”. (Desmond, J., in Defiance Milk Products Co. v. Du Mond, 309 N. Y. 537, 540-541; Paterson v. University of State of New York, 14 N Y 2d 432; Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 79; Matter of Fay, 291 N. Y. 198, 206, 207). But, for all that, due process demands that a law be not unreasonable or arbitrary and that it be reasonably related and applied to some actual and manifest evil. (Matter of Jacobs, 98 N. Y. 98, 110; Fisher Co. v. Woods, 187 N. Y. 90; Nebbia v. New York, 291 U. S. 502.) At pages 526 and 527 of *558 the Nebbia decision, the cases which have been found not to be inconsistent with due process, are collated.
There remain but three other objections to the actions by the county including Local Law No. 1. First that it deprives the defendants of property without due process; second, that the State through the enactment of the amendment of paragraph (o) of subdivision 4 of section 225 of the Public Health Law and the subsequent amendment of the Sanitary Code has preempted the field of regulation of mass gatherings to such an extent that there is nothing left for local government to enact a Local Law about; third, that the Local Law is ex post facto as to these defendants.
The case of Goldblatt v. Town of Hempstead (369 U. S. 590, 594, 595) is a complete answer to the first contention. Indulging in the usual presumption of constitutionality, there can be no finding that the action brought or the regulation enacted is sufficient to render it an unconstitutional taking and this court has already found that it is otherwise a valid police regulation.
Deprivation of the most beneficial use of property does not render the Local Law unconstitutional. (Goldblatt v. Town of Hempstead, supra, p. 592.)
Furthermore, the ex post facto claim of defendants must also fail since this constitutional protection applies only to criminal prosecutions. Since the penal provisions of the Local Law are severable and enforcement is not here being sought, it is not necessary to decide that issue. (Goldblatt v. Town of Hempstead, supra, p. 597.)
Little more need be added in connection with the defendants’ claim that the State has pre-empted the field of legislation governing mass gatherings except to say that the area of mass gatherings to last for less than 24 hours has been left unregulated by the State law or the Sanitary Code as amended. The fact that the county Local Law sets its standard at 10,000 people or more is not inconsistent with the State law because the State’s standard must be read in the conjunctive i.e. “likely to attract five thousand people or more and continue for twenty-four hours”. (Public Health Law, § 225, subd. 4, par. [o].) If both elements are not present, therefore, State law does not apply and the county Local Law applies only if the gathering is for 10,000 or more. Similarly if both elements are present the State law applies and neither the county nor the town' Local Law would apply. Parenthetically since the county has excluded from the operation of its statute those towns which have enacted ordinances, an application to the town, not the county, would have to be made unless the applicant fell within the county *559 definition and the mass gathering contemplated materially affected the health, safety and well being of persons residing outside the territorial jurisdiction of the town. I see no reason why there should not be concurrent jurisdiction in the county and the town because they each may have different public interests to protect considering the territorial jurisdiction each is empowered to control by article IX of the New York Constitution and the Municipal Home Rule Law. It might be indicated that in order to control traffic on the highways certain county roads should be made one way at certain hours. How could a town effectuate this if the county road ran through two or more towns? The county under Municipal Home Rule Law would be the only governmental subdivision enabled to do this under its power of care, management, use of its county roads •(§ 10, subd. 1, par. [iil], cl. a, subcl. [6]). The same argument would apply with respect to hospital and medical facilities which the Town of Fallsburg does not have.
This court finds as a matter of law that there was substantial compliance by the town under the requirements of section 20 of the Municipal Home Rule Law and sections 62 and 63 of the Town Law. (Commission of Public Charities of City of Hudson v. Wortman, 255 App. Div. 241 [1938], affd. 279 N. Y. 711.) The Local Law No. 1 of the Town of Fallsburg has standards which are substantially the same as the county Local Law.
The court consequently finds that the defendants must comply with the requirements of the county Local Law and the town Local Law if they are to propose a program with a limitation of 25,000 tickets for a period of 3% hours.
It is the conclusion of this court that the fee required by section 2 of the county Local Law No. 1 is not a tax upon any of the First Amendment freedoms but is a proper charge for expense to be incurred in connection with the administration of the law. (Cox v. New Hampshire, 312 U. S. 569, 576, 577, supra.) Similarly, there is nothing unreasonable with respect to the required liability insurance policy with limits of $500,000-$1,000,000 for bodily injury or death and $500,000 for property damages (§ 5) in the light of the number of additional vehicles which may use the county roads and thus increase the county’s liability over that which it normally would be upon those particular roads.
The performance bonds required by the second and fourth paragraphs of section 5 of that. Local Law in this court’s opinion transcend the allowable limits of regulation and appear to be repressive. There is no evidence in this record which supports the necessity for the posting of cash or performance bonds *560 in an amount of $100,000 or more. The county has ample security first in its requirement as to the corporate or other organization (§ 4, subds. [a], [b], [m]) and its right to terminate the permit if it finds that the conditions of the permit have not been met (§8), and the penal provisions of the Local Law (§ 9). Similarly the bond provisions of part 7 of the Sanitary Code are repressive in nature and not supported by evidence as to costs which could be involved. These provisions of the Local Law and part 7 are consequently held to be unconstitutional.
In the same vein it is the opinion of this court that the second exemption contained in the Local Law (§ 10, subd. [b]) must be struck down as an invidious discrimination since its language would permit even private enterprise to be exempted from the operation of the law so long as it was ‘ ‘ sponsored by any governmental or municipal agency”. The sponsorship exemption could depend upon many elements which would in no wise be in the public interest, health, safety, etc., of the public in the county. (Queenside Hills Co. v. Saxl, 328 U. S. 80, 85.)
Since the statute contains a separability clause (§ 11) the elimination of these sections does not affect the balance of the Local Law.
By reason of the complexity of the problems which may arise in connection with any one particular mass gathering it would not be possible to narrowly define the standards in either the Local Law or part 7 of the Sanitary Code. The Health Department has issued guidelines for the preparation of the engineering report to accompany the application. These guidelines are approved for purposes of a mass gathering as contemplated by part 7 with the exception of IV, (x), 1, 2, which is found to be unconstitutional. (Matter of Concordia Collegiate Inst. v. Miller, 301 N. Y. 189, 196-197.)
Judgment in favor of the County of Sullivan permanently enjoining the performance of any programs exceeding 3% hours including intermissions and limited to a sale of 25,000 tickets, with advertising limited in scope to a total of 150-mile radius from the .site, is granted upon condition that such injunction may be dissolved and performances so limited be given when proof has been submitted to this court by way of written communications as follows:
1. That a new application has been filed with the town and, after due consideration, a permit issued.
2. That an application has been filed with the county, and after due consideration, a permit issued.
3. That the defendants have complied with the requirements of the Zoning Ordinance of the Town of Fallsburg; the Noise *561 Ordinance of the Town of Fallsburg and the Building Construction Code of the Town of Fallsburg and have been issued a certificate of occupancy.
4. That the defendants have complied with the requirements of the Conservation Law and a permit has been issued.
5. That the defendants have complied with
(a) Part 5 of the Sanitary Code of New York with respect to Drinking Water Supplies.
(b) Part 7 of the Sanitary Code only with respect to the temporary residence requirements.
(c) Part 14 of the Sanitary Code with reference to service food establishments.
(d) Part 19 of the Sanitary Code with reference to refuse disposal.
(e) Article 12 of the Public Health Law with reference to sewerage disposal and sanitation.
(f) Article 26-a of the General Business Law with respect to theatrical syndication financing.
(g) The requirements of the Board of ¡Standards and Appeals with respect to places of public assembly under the Labor Law (art. 17).
It should be understood that the defendants and each of them are also permanently enjoined from acting under the permit or amended permit issued by the Town of Fallsburg on the ground that the application for such permits was filed in bad faith and contained material misrepresentations.
Insofar as the action commenced by the Commissioner of Health is concerned, it has always been the rule that the Sanitary Code inasmuch as it is concerned with public health will be given a liberal interpretation (People v. Frudenberg, 209 N. Y. 218 [1913]; People ex rel. Ogden v. McGowan, 118 Misc. 828 [1921]; Chiropractic Assn. of New York v. Hilleboe, 12 N Y 2d 109 [1962]).
Whether a statute is vague or indefinite is to be determined by whether the persons directly affected by it would receive a sufficiently definite warning as to proscribed conduct. (Paterson v. University of State of New York, supra.) The evidence here sustains the plaintiff’s contention that the experts retained by defendants understood and knew the requirements of the Health Department and that the provisions of those parts of the Sanitary Code applicable including part 7 thereof were not vague and indefinite insofar as those experts were concerned. It is consequently this court’s opinion that the amendment of section 225 (subd. 4, par. [o]) of the Public Health Law and the amendment of part 7 of the Sanitary Code with respect *562 to mass gatherings are valid and reasonable exercises of the police power of the State of New York except as hereinbefore set forth. .Consequently all of defendants’ constitutional objections thereto must fail upon the same reasoning as sustained the Local Law No. 1 of the County of Sullivan.
Judgment in favor of the Commissioner of Health has heretofore been granted to that plaintiff by consent with respect to the 50,000-ticket, 18-hour program.
The court cannot accept as realistic the fact that the optimum ■ number of 1,000 cars could reach the site over the highways involved. The court accepts the number of 500 cars per hour as being able to reach the site with proper signs and traffic controls. That hourly rate when taken with an average of four persons per car would mean that a 5%-hour 25,000-ticket program could result in a traffic flow of 6,250 cars. These could be expected to take 12 hours to arrive and something less than that to leave. In any event the total hours elapsed would be in excess of 24 hours. This court, therefore, concludes that a 5%-hour, 25,000-ticket program would fall within the purview of section 225 (subd. 4, par. [o]) of the Public Health Law and part 7, as amended, of the Sanitary Code. The conclusion reached does not take into consideration the time required, to get to and from the parking areas to the performance site nor the fact that the time of dispersal would be in hours of darkness.
Judgment is, therefore, granted to the Commissioner of Health permanently enjoining the defendants and each of them from holding a mass gathering contemplating a program of 6% hours with ticket sales limited to 25,000 .subject to being dissolved upon proof in writing being furnished to this court
1. That an application has been made under part 7 of the Sanitary Code and a permit issued thereunder.
2. 'Compliance with the requirements of the Zoning Ordinance of the Town of Fallsburg, the Noise Ordinance of the Town of Fallsburg and the Building Construction Code of the Town of Fallsburg.
3. Compliance with the Conservation Law of the State of New York and a permit issued.
4. Compliance with article 26-a of the 'General Business Law with respect to theatrical syndication financing.
This court will retain jurisdiction of these actions for the following purposes:
(a) . Receiving proof of compliance with the judgments granted herein;
(b) Entertaining proceedings to compel compliance, or
(c) punish for contempt.
*563 The provisions of the preliminary injunctions in both actions fixing the limits of liability of the plaintiffs under CPLR 2512 are vacated.