463 F.3d 167
 FIELD DAY, LLC, f/k/a New York Music Festival, LLC, Aeg Live LLC, f/k/a Aeg Concerts LLC, Plaintiffs-Appellees-Cross-Appellants,
v.
COUNTY OF SUFFOLK, Suffolk County Department of Health Services, Suffolk County Executive Robert Gaffney, Commissioner of the Suffolk County Department of Health Services Brian Harper, Commissioner of the Suffolk County Police Department John C. Gallagher, Director of the Suffolk County Department of Health Services Robert Maimoni, Chief of the Bureau of Public Health Protection Bruce Williamson, Principal Public Health Sanitarian Robert Gerdts, Deputy Suffolk County Attorney Robert Cabble, Deputy Suffolk County Executive Joe Michaels, and Sergeant Patrick Maher of the Suffolk County Police Department, Defendants-Appellants,
New York State Health Commissioner Antonia C. Novello, Defendant-Appellant,
Town of Riverhead and Riverhead Chief of Police David Hegermiller, Defendants.
 Docket No. 05-5341-CV(L).
 Docket No. 05-5870-CV(XAP).
 Docket No. 05-6445-CV(CON).
 United States Court of Appeals, Second Circuit.
 Argued: May 16, 2006.
 Decided: September 12, 2006.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Christopher A. Jeffreys, Assistant County Attorney (Christine Malafi, County Attorney, on the brief), Hauppauge, NY, for Defendants-Appellants.
 Gregory Silbert, Assistant Solicitor General (Michelle Aronowitz, Deputy Solicitor General, of counsel, Eliot Spitzer, Attorney General, on the brief), New York, NY, for Defendant-Appellant.
 Charles E. Bachman (Peter Obstler, of counsel), O'Melveny & Meyers LLP, New York, NY, for Plaintiffs-Appellees-Cross-Appellants.
 Before: MINER and WESLEY, Circuit Judges, and SWAIN, District Judge.[1]
 MINER, Circuit Judge.
 
 
 1
 These consolidated interlocutory appeals and cross-appeal arise from two orders of the United States District Court for the Eastern District of New York (Hurley, J.) in an action brought against state, county, town, and individual public officer defendants, pursuant to 42 U.S.C. § 1983, alleging violations of First Amendment free speech rights. The underlying action arises from the failure by the county defendants to grant a permit to plaintiff concert promoters to hold a two-day concert festival in a public park. The complaint asserts both "facial" and "as applied" constitutional challenges. The first order, dated September 30, 2005:(i) declared portions of N.Y. PUBLIC HEALTH LAW § 225(5)(o) (the "Mass Gathering Law"), and the New York Sanitary Code, N.Y. COMP. R. & REGS. tit. 10, § 7-1.40, facially unconstitutional; (ii) severed the unconstitutional portions of the statute and regulation; and (iii) granted an injunction against application of those portions to plaintiffs by state, county, and town defendants. The second order, also dated September 30, 2005, denied motions for dismissal pursuant to Fed.R.Civ.P. 12(b)(6). These motions were premised on plaintiffs' lack of standing and defendants' qualified immunity and were made by public officer defendants in their individual capacities.
 
 BACKGROUND
 
 2
 In June 2002 plaintiffs-appellees-cross-appellants Field Day, LLC, f/k/a New York Music Festival, and AEG Live, LLC, f/k/a AEG Concerts, LLC, (collectively, "Field Day") began efforts to promote and produce a two-day music and art festival ("the Festival"), which was to be held June 7-8, 2003, in the Town of Riverhead ("Riverhead"), County of Suffolk ("Suffolk County"), New York. Field Day expected the Festival to draw 35,000 to 40,000 people. Because of the duration and size of the Festival, Field Day was constrained by the provisions of New York's Mass Gathering Law. See N.Y. PUBLIC HEALTH LAW § 225(5)(o) (providing that the Mass Gathering Law is to apply to gatherings that are "likely to attract five thousand people or more and continue for twenty-four hours or more"). Over the next several months, during which Field Day worked with Riverhead and Suffolk County to obtain the requisite mass gathering permit, Field Day alleges that Riverhead and Suffolk County, through their respective employees, acted unlawfully in failing to approve its application through the "manipulation of constitutional infirmities" in the Mass Gathering Law. Field Day ascribes Riverhead and Suffolk County's failure to approve its application "to `political' decisions by `upper level' Suffolk County officials," a "dislike for rock music concerts and their fans among certain officials," and/or "the active involvement and political influence of Clear Channel Entertainment, Inc., a media conglomerate that is [Field Day's] largest competitor in the concert promotion industry."
 
 
 3
 Field Day brought suit pursuant to 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. Field Day asserted both "facial" constitutional challenges to the Mass Gathering Law and "as applied" constitutional challenges to the actions of Riverhead, Suffolk County, and numerous officials and employees charged with implementing and enforcing the Mass Gathering Law. On September 30, 2005, the District Court subsequently issued the two orders from which the instant appeals are taken.
 
 
 4
 The first order dealt exclusively with Field Day's "facial" challenges and request for declaratory relief. The District Court found the Mass Gathering Law to be "constitutionally infirm because it allows permit denial based on unspecified considerations of `health and safety' or `security of life and health.'" Accordingly, the District Court declared portions of New York's Mass Gathering Law and the implementing provisions of the New York Sanitary Code facially unconstitutional. The District Court found, however, that those portions of the Mass Gathering Law and Sanitary Code not pertaining to the constitutionally impermissible "health and safety" and "security of life and health" provisions were constitutionally sound. The District Court then determined that the offending portions of the Mass Gathering Law and Sanitary Code could be severed from the valid provisions for the purposes of granting a preliminary injunction. Accordingly, the District Court severed the unconstitutional portions of the statute and regulation and granted an injunction against application of those portions to Field Day by defendant-appellant New York State Health Commissioner Antonia C. Novello (the "State") and Suffolk County and its representatives, agents, and employees. This order was appealed from by the State and cross-appealed from by Field Day. This Court has jurisdiction over the interlocutory appeal and cross-appeal from this first order pursuant to 28 U.S.C. § 1292(a)(1).
 
 
 5
 The second order dealt only with motions to dismiss brought by Riverhead, the Chief of Police of Riverhead, Suffolk County, the Suffolk County Department of Health Services, and numerous officers and employees of Suffolk County (the "Suffolk County Employees"), pursuant to Fed.R.Civ.P. 12(b)(6). The motions to dismiss were premised, inter alia, on Field Day's alleged lack of standing and the alleged qualified immunity of the Chief of Police and the Suffolk County Employees. The District Court first found that Field Day, as a concert promoter, had free speech rights and standing to challenge the enforcement of the Mass Gathering Law. The District Court then found that qualified immunity could not be granted or denied at the pleadings stage of this case because Field Day's Second Amended Complaint adequately stated a claim in alleging a violation of a clearly established constitutional right. The Suffolk County employees appeal from the second order, and this Court has jurisdiction over the interlocutory appeal from this order pursuant to 28 U.S.C. § 1291 and the "collateral order" doctrine of Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). See McKenna v. Wright, 386 F.3d 432, 436 (2d Cir.2004).
 
 DISCUSSION
 I. The Mass Gathering Law
 
 6
 The 1969 Woodstock Music Festival is probably the best known and most romanticized music festival in American history. Conditions on the ground, however, were less than romantic. The show had been planned for a maximum of 50,000 attendees, but around 500,000 concert goers showed up, most crashing the gates. The highways leading to the concert were jammed with traffic for miles and people abandoned their cars and walked to the concert area. The weekend was rainy, and basic facilities and services, such as first-aid, toilets, and food and potable water, were overcrowded and over-taxed. Two people died — one from a drug overdose, the other run over by a tractor — though two births reportedly occurred. See generally N.Y. Bill Jacket, 1970 A.B. 5925-B Ch. 889; MSN Encarta, http://encarta.msn.com/encyclopedia_761588927/Woodstock_Festival.html (last viewed August 16, 2006).
 
 
 7
 About one year after Woodstock, and in direct reaction to the conditions above mentioned, the State of New York adopted the Mass Gathering Law. Intended as a "consumer protection" law, it was "designed to protect young people who go to festivals from irresponsible entrepreneurs who do not provide adequate public health and safety conditions." As is relevant to the instant appeal, New York's Mass Gathering Law provides:
 
 
 8
 The sanitary code may ... require that application be made for a permit to... hold or promote by advertising or otherwise a mass gathering which is likely to attract five thousand people or more and continue for twenty-four hours or more and authorize appropriate officers or agencies to issue such a permit when the applicant is in compliance with the established regulations and when it appears that ... such gathering [can be] held without hazard to health and safety; establish regulations with respect to such gatherings to provide for: the furnishing of adequate undertakings to secure full compliance with the sanitary code and other applicable law, adequate and satisfactory water supply and sewerage facilities, adequate drainage, adequate toilet and lavatory facilities, adequate refuse storage and disposal facilities, adequate sleeping areas and facilities, wholesome food and sanitary food service, adequate medical facilities, insect and noxious weed control, adequate fire protection, and such other matters as may be appropriate for security of life or health. In his review of applications for permits for the holding or promoting of such a gathering the permit-issuing official may require such plans, specifications and reports as he shall deem necessary for a proper review, and in his review of such applications, as well as in carrying out his other duties and functions in connection with such a gathering, the permit-issuing official may request and shall receive from all public officers, departments and agencies of the state and its political subdivisions such cooperation and assistance as may be necessary and proper[.]
 
 
 9
 N.Y. PUBLIC HEALTH LAW § 225(5)(o).
 
 
 10
 In order to implement the Mass Gathering Law, Title 10, part 7, subpart 7.1 of the New York Sanitary Code provides certain specific regulations governing the issuance of Mass Gathering Permits. Section 7-1.40 provides:
 
 
 11
 (a) No person shall hold or promote, by advertising or otherwise, a mass gathering unless a permit has been issued for the gathering by the permit-issuing official.
 
 
 12
 (b) Application for a permit to promote or hold a mass gathering shall be made to the permit-issuing official, on a form and in a manner prescribed by the State Commissioner of Health, by the person who will promote or hold the mass gathering. Application for a permit to promote or hold a mass gathering shall be made at least 15 days before the first day of advertising and at least 45 days before the first day of the gathering. Water and sewage facilities shall be constructed and operational not later than 48 hours before the first day of the mass gathering. The application shall be accompanied by such plans, reports and specifications as the permit-issuing official shall deem necessary. The plans, reports and specifications shall provide for adequate and satisfactory water supply and sewerage facilities, adequate drainage, adequate toilet and lavatory facilities, adequate refuse storage and disposal facilities, adequate sleeping areas and facilities, wholesome food and sanitary food service, adequate medical facilities, insect and noxious weed control, adequate fire protection, and such other matters as may be appropriate for security of life or health.
 
 
 13
 . . .
 
 
 14
 (d) A permit may be revoked by the permit-issuing official or the State Commissioner of Health if he finds that the mass gathering for which the permit was issued is maintained, operated or occupied in violation of law, this Chapter, or the sanitary code of the health district in which the mass gathering is located. A permit may be revoked upon request of the permittee or upon abandonment of operation.
 
 
 15
 N.Y. Comp. R. & Regs. tit. 10, § 7-1.40.
 
 
 16
 The Sanitary Code also provides that all mass gathering permit applications include an "engineering report" containing, inter alia,
 
 
 17
 detailed plans for transportation arrangements from noncontiguous parking facilities to the site to fully serve all reasonably anticipated requirements at a rate of no less than 20,000 persons per hour; including a statement from the county sheriff, State police, New York State Department of Transportation or other law enforcement agency certifying that the traffic control plan is satisfactory[.]
 
 
 18
 Id. § 7-1.41(d)(2).
 
 II. Constitutional Challenges Identified
 
 19
 A statute may unconstitutionally restrict speech in one of two primary ways. First, a statute may restrict speech based on the content of that speech. Such content-based restrictions are, almost always, unconstitutional: "[T]he First Amendment, subject only to narrow and well-understood exceptions, does not countenance governmental control over the content of messages expressed by private individuals." Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 641, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). Second, a statute may restrict speech incidentally, that is, the statute itself may not aim to restrict speech though, through its operation, it may do so — such statutes are generally referred to as "content neutral." Laws that govern the "time, place, or manner" of protected speech are content neutral and "valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (collecting cases); see also Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) ("The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys."). The parties agree that New York's Mass Gathering Law and the implementing provisions of the Sanitary Code are content-neutral, time-place-manner restrictions.
 
 
 20
 Just as there are two classifications of statutes for First Amendment free speech purposes, there are two ways to challenge a statute on First Amendment free speech grounds. A "facial challenge" to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual. See City of Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750, 770 n. 11, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). An "as-applied challenge," on the other hand, requires an analysis of the facts of a particular case to determine whether the application of a statute, even one constitutional on its face, deprived the individual to whom it was applied of a protected right. See, e.g., Wisconsin Right to Life, Inc. v. FEC, ___ U.S. ___, 126 S.Ct. 1016, 163 L.Ed.2d 990 (2006) (holding that McConnell v. Federal Election Comm'n, 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003), which held the Bipartisan Campaign Reform Act of 2002 (BCRA), § 203, facially constitutional, did not foreclose subsequent "as-applied" challenges). As noted, Field Day attacks the Mass Gathering Law and the Sanitary Code both facially and as applied.
 
 III. Field Day's Standing
 
 21
 The Suffolk County Employees argue that, although Field Day may assert its facial challenge, it lacks standing to assert any as-applied claim under the Mass Gathering Law. The basis for the standing argument made by the Suffolk County Employees is their belief that Field Day is bringing and can only bring "third party" claims; i.e. that the only rights involved in this case "belong[ ] to some other individuals, i.e., performers and patrons of the proposed concert." The District Court stated that this contention "had no merit." We agree. Field Day, as a concert organizer and promoter, has obvious "first party" First Amendment claims.
 
 
 22
 This Court's review of whether a plaintiff has constitutional standing is de novo. Shain v. Ellison, 356 F.3d 211, 214 (2d Cir.2004). Under Article III of the Constitution, federal courts have jurisdiction only over "cases" and "controversies." U.S. Const. art. III, § 2, cl. 1. Standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Three elements make up the "irreducible constitutional minimum of standing." Defenders of Wildlife, 504 U.S. at 560, 112 S.Ct. 2130. In order to have constitutional standing, first, the plaintiffs "must have suffered an injury in fact — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Id. Second, "there must be a causal connection between the injury and the conduct complained of — the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not... the result [of] the independent action of some third party not before the court." Id. at 560-61, 112 S.Ct. 2130 (internal quotation marks omitted). Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Id. at 561, 112 S.Ct. 2130 (internal quotation marks omitted). Moreover, the "party invoking federal jurisdiction bears the burden of establishing these elements." Id. As the party invoking federal jurisdiction, a plaintiff bears the burden of establishing that he has suffered a concrete injury or is on the verge of suffering one. See id.
 
 
 23
 It is well-settled that event organizers have First Amendment rights and have standing to protect those rights.
 
 
 24
 [A] private speaker does not forfeit constitutional protection simply by combining multifarious voices, or by failing to edit their themes to isolate an exact message as the exclusive subject matter of the speech. Nor, under our precedent, does First Amendment protection require a speaker to generate, as an original matter, each item featured in the communication.
 
 
 25
 Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, 515 U.S. 557, 569-70, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995). Moreover, because a concert organizer has standing to facially challenge time-place-manner restrictions on speech in its efforts to produce a concert, as Suffolk County concedes, the same First Amendment rights are more than sufficient in this case to support a § 1983 claim where those rights allegedly have been violated. See Rock Against Racism, 491 U.S. at 787-88, 109 S.Ct. 2746 (Respondent concert organizer, prior to event, obtained preliminary injunction against some aspects of municipal sound amplification guidelines. "After the concert, respondent amended its complaint to seek damages and a declaratory judgment striking down the guidelines as facially invalid."). Field Day's First Amendment free speech rights to organize an expressive activity, to wit, a music concert,[2] were alleged to have been violated by Suffolk County. Accordingly, Field Day has standing to pursue its as-applied claims.
 
 
 26
 IV. Facial Challenge to the Mass Gathering Law and Injunctive Relief
 
 A. The Appeal Analyzed
 1. Statutory Standards
 
 27
 "[T]he constitutionality of a statute is a legal question subject to de novo review." United States v. Murphy, 979 F.2d 287, 289 (2d Cir.1992). "[W]hen a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." City of Lakewood, 486 U.S. at 755-56, 108 S.Ct. 2138 (collecting cases). In order for a facial challenge to a content-neutral, time-place-manner permit law to succeed, the challenger must show that the statute does not "contain adequate standards to guide the official's decision and render it subject to effective judicial review." Thomas v. Chicago Park Dist., 534 U.S. 316, 323, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002).
 
 
 28
 [A] facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers. This is not to say that the press or a speaker may challenge as censorship any law involving discretion to which it is subject. The law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks.
 
 
 29
 City of Lakewood, 486 U.S. at 759, 108 S.Ct. 2138.
 
 
 30
 When evaluating a [facial] First Amendment challenge ... we may examine not only the text of the ordinance, but also any binding judicial or administrative construction of it. And we are permitted — indeed, required — to consider the well-established practice of the authority enforcing the ordinance. All of these are essential as we try to make our way through the Scylla of regulations that are so tightly worded that the flexibility needed for administration is lacking, and the Charybdis of language so loose that, as a practical matter, courts become the licensing bureau.
 
 
 31
 MacDonald v. Safir, 206 F.3d 183, 191 (2d Cir.2000); see also City of Lakewood, 486 U.S. at 770 n. 11, 108 S.Ct. 2138 ("[W]hen a state law has been authoritatively construed so as to render it constitutional, or a well-understood and uniformly applied practice has developed that has virtually the force of a judicial construction, the state law is read in light of those limits."). In the absence of state interpretation,[3] federal courts "will presume any narrowing construction or practice to which the law is fairly susceptible." City of Lakewood, 486 U.S. at 770 n. 11, 108 S.Ct. 2138 (quotation marks and citations omitted).
 
 
 32
 "Statutory construction ... is a holistic endeavor." Auburn Hous. Auth. v. Martinez, 277 F.3d 138, 144 (2d Cir.2002) (internal quotation marks omitted; alteration in original). In interpreting statutes, this Court reads statutory language in light of the surrounding language and framework of the statute. Id. "`[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems,' we may `construe the statute to avoid such problems unless such construction is plainly contrary to the intent of [the Legislature].'" Empire HealthChoice Assur., Inc. v. McVeigh, 396 F.3d 136, 144 (2d Cir.2005) (quoting Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988)).
 
 
 33
 Field Day argued, and the District Court found, that the "catch-all" provisions of the statutory/regulatory scheme — (i) "... when it appears that such gathering [may be held] without hazard to health or safety ..." and (ii) "... such other matters as may be appropriate for security of life or health ..." in PUBLIC HEALTH LAW § 225(5)(o), and (iii) "... such other matters as may be appropriate for security of life or health ..." in Section 7-1.40(b) of the Sanitary Code — were "untethered to any standards for determination, effectively giv[ing] the permit-issuing officials unconstitutionally unbridled discretion to deny a permit for any reason they see fit." The District Court found particularly troubling the fact that, unlike the regulation found constitutional in Chicago Park District, 534 U.S. at 316, 122 S.Ct. 775, the Mass Gathering Law and Sanitary Code provisions did not limit a permitting official's concerns about "health and safety" and "life or health" to those that were "reasonable." The State argues, conversely, that these provisions are constitutionally acceptable under Chicago Park District because "the opportunity to engage in content regulation ... simply is not afforded by the provision[s'] plain language." Because each party argues that Chicago Park District supports its position, we begin our analysis with that case.
 
 
 34
 In Chicago Park District a facial challenge was brought against regulations governing the granting of permits for the use of public property in Chicago. Id. at 318, 320, 122 S.Ct. 775. The regulations provided that the Park District could deny an application for a permit only on one of thirteen specifically enumerated grounds. Among the permissible grounds for denial of a permit was that "the use or activity intended by the applicant would present an unreasonable danger to the health or safety of the applicant, or other users of the park, of Park District Employees or of the public." Id. at 319 n. 1, 122 S.Ct. 775 (emphasis added). The Supreme Court held the at-issue regulations constitutional, as the Park District could "deny a permit only for one or more of the reasons set forth in the ordinance.... These grounds are reasonably specific and objective, and do not leave the decision to the whim of the administrator." Id. at 324, 122 S.Ct. 775 (internal quotation marks and citations omitted).
 
 
 35
 Although the Supreme Court determined that the phrase "unreasonable danger to the health or safety" was "reasonably specific and objective," it did not further elaborate upon a "reasonableness" standard. Given this omission, and in the absence of any express reasonableness limitation in the catch-all provisions in the Mass Gathering Law, each party in this case focuses its arguments on a particular part of the Mass Gathering Law's language. The State argues that "health and safety" and "life or health" is, per Chicago Park District, a constitutionally adequate standard — that the Supreme Court did not "state or suggest that the Chicago Ordinance's express inclusion of the term `unreasonable' played any role in that Court's analysis." Field Day argues, conversely, that without the inclusion of such a "reasonableness" limitation the Mass Gathering Law and the Sanitary Code "are devoid of any objective standards to guide the [permit-issuing] official's decision about what constitutes an objective and bona fide `hazard to public health and safety' sufficient to warrant a veto of the planned event." Because we determine that the phrases "health and safety" and "life or health" are capable of guiding a permitting official's decision and rendering that decision subject to effective judicial review, we hold that the "catch-all provisions" of the Mass Gathering Law and Sanitary Code are constitutional on their face.
 
 
 36
 The phrases "health and safety" and "life or health" are, as an initial observation, less constitutionally suspect than language employed in statutes that have been found to be unconstitutional. In Shuttlesworth v. City of Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969), the Supreme Court held unconstitutional an ordinance that permitted a municipal commission to refuse to issue a permit to hold a "parade, procession or other public demonstration" if in "its judgment the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be refused." Id. at 149-50, 89 S.Ct. 935. The Court explained that "a municipality may not empower its licensing officials to roam essentially at will, dispensing or withholding permission to speak, assemble, picket, or parade according to their own opinions regarding the potential effect of the activity in question on the `welfare,' `decency,' or `morals' of the community." Id. at 153, 89 S.Ct. 935; see also Nichols v. Vill. of Pelham Manor, 974 F.Supp. 243, 250 n. 5 (S.D.N.Y.1997) (declaring unconstitutional a municipal ordinance permitting the chief of police to deny a permit to "solicit alms, or make any other solicitation or distribute handbills, tracts, literature or similar articles within the village" when doing so would "protect the health, comfort and convenience" of village residents).
 
 
 37
 In City of Lakewood, the Supreme Court confronted an ordinance that provided that: "[t]he Mayor shall either deny the application [for a permit], stating the reasons for such denial or grant said permit subject to the following terms ....'" City of Lakewood, 486 U.S. at 769, 108 S.Ct. 2138 (internal quotation marks omitted). Among those terms was "such other terms and conditions deemed necessary and reasonable by the Mayor." Id. (internal quotation marks omitted). The Court determined that this ordinance not only placed no limits on the Mayor's discretion to deny a permit, but also that the ordinance placed no restraint on the conditions that the Mayor could impose on the granting of a permit. Id. at 769, 772, 108 S.Ct. 2138. Accordingly, the Court found the ordinance to be unconstitutional.
 
 
 38
 Similarly, in MacDonald, 206 F.3d 183, this Court held that two provisions of the New York City Administrative Code governing parade permits, "unless constrained by administrative construction or by well-established practice, appear to afford the Commissioner exactly the sort of discretion that has been found to violate the First Amendment." Id. at 192. Those challenged provisions included, inter alia, that the police commissioner could "deny a permit if he believes the parade `will be disorderly in character or tend to disturb the public peace'" and that the police commissioner could "grant a parade permit for any `occasion[ ] of extraordinary public interest, not annual or customary.'" Id. The authority of a permit official to consider issues of "health and safety" and "life and health," conferred by the Mass Gathering Law and the Sanitary Code, is much more specific and objective. Considerations of "welfare," "decency," "morals," or "convenience and comfort" invite a public official to consider the content of speech in making permitting decisions. See Forsyth County, Ga. v. Nationalist Movement, 505 U.S. 123, 134, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) ("Listeners' reaction to speech is not a content-neutral basis for regulation."). An utter lack of guidance may permit a public official to consider the content of speech. See Chicago Park District, 534 U.S. at 323, 122 S.Ct. 775 ("Where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content." (citing Forsyth County, 505 U.S. at 131, 112 S.Ct. 2395)). By comparison, it is impossible to see how the consideration of "health and safety" or "life and health" interests would have any effect on the content of speech in the context of a scheme specifically designed to promote such interests. The phrases "health and safety" or "life and health" simply cannot be reasonably construed to "give[ ] a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." City of Lakewood, 486 U.S. at 759, 108 S.Ct. 2138.
 
 
 39
 That the terms "health and safety" or "life and health" do not establish with absolute certainty each and every concern or issue pertaining to life, health, and safety that a public official may raise before issuing a Mass Gathering permit does not render the statutory scheme unconstitutional. "[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity," and "flexible" standards granting "considerable discretion" to public officials can pass constitutional muster. Rock Against Racism, 491 U.S. at 794, 109 S.Ct. 2746. The catch-all provisions of the Mass Gathering Law and the Sanitary Code — "health and safety" and "life or health" — are "reasonably specific and objective, and do not leave the decision to the whim of the administrator." Chicago Park District, 534 U.S. at 324, 122 S.Ct. 775.
 
 
 40
 Nevertheless, Field Day argues that the catch-all provisions "are devoid of any objective standards" to guide an official's decision whether to grant a Mass Gathering Permit. Specifically, Field Day complains that the Mass Gathering Law permits an official to use an unreasonable concern about life and health to deny a permit to a disfavored speaker. Although the specific health and safety concerns given in the Mass Gathering Law and Sanitary Code are conditioned by an "adequacy" requirement ("adequate and satisfactory water supply and sewerage facilities, adequate drainage," etc.), and "adequate" has been defined by the Sanitary Code to mean "reasonable," see N.Y. Comp. R. & Regs. tit. 10, § 7-1.1, no such "adequacy" conditions are explicitly placed on the catch-all provision — "other matters as may be appropriate for security of life or health."
 
 
 41
 Given the concern that the lack of an objective standard might render the catch-all provision unconstitutional, and this Court's duty to interpret the statute, if possible, to avoid such concerns, see Empire HealthChoice Assur., 396 F.3d at 144-45, it is possible to interpret the catch-all provision as providing such an objective standard. Although not defined in the Mass Gathering law or in the Sanitary Code, the word "appropriate" is generally defined as "suitable" or "proper." See e.g., OXFORD ENGLISH DICTIONARY ONLINE, http://dictionary.oed.com/entrance.dtl (search for "appropriate") "([s]pecially fitted or suitable, proper") (definition from the 2d ed.1989) (last visited July 19, 2006); Webster's Third New Int'l Dictionary, 106 (1981) ("specially suitable"); The Random House College Dictionary, 66 (Revised Ed., 1980) ("suitable or fitting for a particular purpose, occasion, person, etc."). Given the whole of the statutory scheme, see Auburn Housing Auth., 277 F.3d at 144, "other matters" are "appropriate" to "secur[e]" "life or health" only to the extent that "adequate" provision for that concern about "life or health" has not yet been provided. As set out above, the meaning of "life or health" is understood by reference to the remainder of the statute, and "adequate" is defined as "sufficient to accomplish the purpose for which something is intended, and to such a degree that no unreasonable risk to health or safety is presented." N.Y. Comp. R. & Regs. tit. 10, § 7-1.1. It therefore follows that allowing a public official to condition the granting of a mass gathering permit on "other matters as may be appropriate for security of life or health" allows the official only to consider whether a proposed mass gathering presents unreasonable risks to life or health.
 
 
 42
 The State further contends that the language in the first catch-all provision giving the permit official the power to decide what circumstances appear to present a hazard to health and safety does not render the permit scheme wholly subjective. The first clause of the Mass Gathering law provides: "The sanitary code may ... authorize appropriate officers or agencies to issue such a permit when the applicant is in compliance with the established regulations and when it appears that ... such gathering [can be] held without hazard to health and safety ...." N.Y. PUBLIC HEALTH LAW § 225(5)(o). The State argues that this clause does not directly govern permitting officials, but rather serves as an enabling clause authorizing the State to promulgate the regulations authorizing "appropriate officers" to issue mass gathering permits, and therefore only the Sanitary Code "sets forth the standards that [those officers] are to apply." We agree with this argument.
 
 
 43
 Moreover, as explained above, the Mass Gathering Law and Sanitary Code establish an objective test for satisfaction of the conditions required to obtain a mass gathering permit — whether unreasonable risks to genuine issues of life or health are presented by the mass gathering. This inquiry requires a permit official to exercise his or her discretion in the first instance to determine if a risk to life or health is presented and, if so, whether that risk is or can be rendered reasonable through the actions of the applicant. It will "appear[ ]" to that official that a mass gathering can be "held without hazard to health and safety" when, in the exercise of that discretion, he or she has applied an objective standard and found no unreasonable risks that would give rise to genuine concerns for life or health.
 
 
 44
 Given the foregoing, this Court can find no meaningful difference between the catch-all provisions of the Mass Gathering Law and the Sanitary Code and the "unreasonable danger to the health or safety" provision found to be constitutional in Chicago Park District, 534 U.S. at 319 n. 1, 324, 122 S.Ct. 775. Although it is always possible for an official to violate an applicant's constitutional rights by misapplying the authority granted to him by the Mass Gathering Law and Sanitary Code, that concern does not render a statute facially unconstitutional. See id. at 324-25, 122 S.Ct. 775 (Where a regulation permitted some level of appropriately bounded discretion "abuse must be dealt with if and when a pattern of unlawful favoritism appears, rather than by insisting upon a degree of rigidity that is found in few legal arrangements."). In sum, the Mass Gathering Law and the Sanitary Code, including the catch-all provisions, "are reasonably specific and objective, and do not leave the decision to the whim of the administrator." Id. at 324, 122 S.Ct. 775. Accordingly, we must reverse that portion of the District Court's judgment declaring the catch-all provisions of the Mass Gathering Law and Sanitary Code to be unconstitutional.
 
 2. Injunctive Relief
 
 45
 The District Court granted Field Day's motion for preliminary injunction prohibiting enforcement against Field Day by the State, Suffolk County, and Riverhead of those sections of the Mass Gathering Law and Sanitary Code that the District Court found unconstitutional. The District Court first determined, in accordance with its findings as to unconstitutionality, that Field Day had demonstrated that it was "likely to succeed on the merits of [its] underlying challenge to the constitutionality of the Mass Gathering Law." The District Court, relying on Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), also found that Field Day would be irreparably harmed absent the issuance of the injunction because "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."
 
 
 46
 This Court reviews a decision to grant a preliminary injunction for abuse of discretion. Mastrovincenzo v. City of New York, 435 F.3d 78, 88 (2d Cir.2006). "The District Court abuses its discretion when (1) its decision rests on an error of law ... or a clearly erroneous factual finding, or (2) its decision — though not necessarily the product of a legal error or a clearly erroneous factual finding — cannot be located within the range of permissible decisions." Id. The injunction at issue in the case at bar is clearly a "prohibitory preliminary injunction," — it "stay[s] `government action taken in the public interest pursuant to a statutory or regulatory scheme.'" Id. (quoting Plaza Health Labs., Inc. v. Perales, 878 F.2d 577, 580 (2d Cir.1989)). Prohibitory preliminary injunctions are permitted "only when the moving party has demonstrated that (1) absent injunctive relief, he will suffer `irreparable injury,' and (2) there is `a likelihood that he will succeed on the merits of his claim.'" Id. (citing Plaza Health Labs., 878 F.2d at 580). Injuries to First Amendment rights, if being threatened or currently occurring, will satisfy the "irreparable injury" requirement. Elrod, 427 U.S. at 373, 96 S.Ct. 2673; New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). This Court has warned, however, that "conjectural chill is not sufficient to establish real and imminent irreparable harm." Latino Officers Ass'n v. Safir, 170 F.3d 167, 171 (2d Cir.1999).
 
 
 47
 The District Court's findings as to both likelihood and injury were dependent on its finding of facial unconstitutionality. Because we have determined that the Mass Gathering Law and Sanitary Code are not facially unconstitutional, we must reverse the preliminary injunction. Accordingly, the District Court's determination as to facial unconstitutionality is affirmed in part and reversed in part, and the preliminary injunction must be dissolved.
 
 B. The Cross-Appeal Analyzed
 
 48
 Field Day, in its cross-appeal, argues that the District Court erred in three respects in determining that the remainder of the Mass Gathering Law was constitutional.
 
 1. Mandatory Issuance of Permits
 
 49
 First, Field Day argues that the Mass Gathering Law is unconstitutional because it "`authorizes' but does not require the issuance of a mass gathering permit to an applicant who has satisfied all of the permit requirements." Field Day also draws on the 1970 press release announcing the passage of the Mass Gathering Law, which stated that "permits may be issued `when it appears that ... such gathering [can be] held without hazard to public health or safety.'" (emphasis added).
 
 
 50
 The District Court determined that, although the Mass Gathering Law "nowhere explicitly states that once an acceptable permit application is submitted, it must be approved," New York law generally provides that "`mandatory words may be interpreted in a merely permissive sense or vice versa,'" (quoting McKinney's Statutes § 171 cmt.) (footnotes omitted), and further determined that, to the extent the Mass Gathering Law was "permissive" and "may be applied to favor certain speakers over others, a more reasonable approach than striking the entire law from the outset is to deal with such a pattern of abuse when it happens" (citing Chicago Park Dist., 534 U.S. at 324-25, 122 S.Ct. 775).
 
 
 51
 As with the parties' disagreement about the meaning of "appears," the resolution of this issue is rendered more difficult than it should be by the shortcomings of the Sanitary Code. The word "authorize" appears in the first clause of the Mass Gathering Law and merely qualifies what the Sanitary Code may do — in this case, "authorize officers to issue a permit." See N.Y. PUBLIC HEALTH LAW § 225(5)(o). If the Sanitary Code explicitly addressed a public official's duty to issue a mass gathering permit this would be a non-issue. The Sanitary Code, however, says nothing about a public official's duty, mandatory or discretionary, to issue (or deny) a permit. The Sanitary Code makes clear that no mass gathering may be held without a permit, provides the form and schedule for applying for a permit, dictates what additional information must be submitted with the application, and sets forth the conditions under which a mass gathering permit "may be revoked" — but nowhere does the Sanitary Code provide that a permit shall (or may) or shall not (or may not) be issued or under what circumstances. See N.Y. Comp. R. & Regs. tit. 10, § 7-1.40(a), (b), and (d).
 
 
 52
 As previously noted, this Court must construe statutes, where necessary and possible, to avoid serious constitutional issues. See, e.g., Empire HealthChoice Assur., 396 F.3d at 144-45. Were the Mass Gathering Law and Sanitary Code read to "authorize" an official to deny a mass gathering permit even where all statutory and regulatory requirements had been met and no unreasonable danger to life or health was present, the statutory/regulatory scheme would be of more than doubtful constitutional validity. See, e.g., City of Lakewood, 486 U.S. at 770, 108 S.Ct. 2138 (A presumption that an official will act in good faith and adhere to standards absent from the regulation's face is undermined when the official is granted unbridled discretion); Dillon v. Municipal Court, 4 Cal.3d 860, 94 Cal.Rptr. 777, 484 P.2d 945, 952 (1971) ("The Seaside ordinance is not only devoid of all standards but, to make matters worse, contains no guarantee that a permit will issue even if the application meets all of the five conditions of the section."). Although the Supreme Court has stated that it " will not write nonbinding limits into a silent state statute," City of Lakewood, 486 U.S. at 770, 108 S.Ct. 2138, the Court has also stated that limits may be explicitly provided "by textual incorporation, binding judicial or administrative construction, or well-established practice." Id.
 
 
 53
 Here, although there is no specific language requiring the issuance of permits in the Mass Gathering Law and Sanitary Code, New York law does generally require that licenses be issued if an applicant satisfies all statutory and regulatory requirements. See Bologno v. O'Connell, 7 N.Y.2d 155, 158 (N.Y. 1959), 196 N.Y.S.2d 90, 164 N.E.2d 389 ("Refusal to issue a license would, of course, be arbitrary and in excess of reasonable discretion if based solely upon a ground which the Commissioner may not consider."); Picone v. Comm'r of Licenses of New York City, 241 N.Y. 157, 161 (N.Y. 1925), 149 N.E. 336 ("If an applicant for a license can show that he is a fit and proper person to engage in a licensed business under the provisions of the licensing statute, the licensing officer may not arbitrarily impose limitations not contained in the statute upon his right to do business."). We read the Mass Gathering Law and Sanitary Code as bound by this construction and interpret the permissive word "authorize" as mandatory. Accordingly, neither the Mass Gathering Law nor the Sanitary Code allows an official to deny a permit to an applicant who has otherwise satisfied the strictures of the statutory and regulatory requirements.
 
 2. Requests for Assistance
 
 54
 Second, Field Day argues that the last clause of the Mass Gathering Law, providing that "in his review of such applications, as well as in carrying out his other duties and functions in connection with such a gathering," a permit issuing official "may request and shall receive from all public officers, departments and agencies of the state and its political subdivisions such cooperation and assistance as may be necessary and proper," N.Y. PUBLIC HEALTH LAW § 225(5)(o), unconstitutionally permits such an official to "refuse to request assistance, even where such assistance is both necessary and proper." As an example, Field Day posits that an official may "capriciously demand[ ]" that uniformed police officers provide security for the festival but then "refuse[ ] to provide those officers." The State counters that Field Day "badly misunderstand[s] the provision" because the Mass Gathering Law does not provide for assistance to the speaker but, instead, to the permit-issuing official. According to the State, such assistance is limited to those duties of the permitting official — reviewing applications, granting permits, and revoking permits — established by the Sanitary Code. See N.Y. Comp. R. & Regs. tit. 10, § 7-1.40. The State argues that the provision of security staff is expressly the duty of the mass gathering applicant. See N.Y. Comp. R. & Regs. tit. 10, § 7-1.40(e) (setting forth the "[a]dditional duties of a permittee for a mass gathering," and requiring that "[a] maintenance and internal security staff acceptable to the permit-issuing official shall be provided"). The State also argues that New York law permits this Court to read "permissive" words as "mandatory" if such construction furthers legislative intent. See N.Y. STAT. § 171 cmt.[4]
 
 
 55
 The answer to Field Day's challenge comes in two parts. First, in accordance with the comments to N.Y. STAT. § 171 and this Court's duty to read the statute as constitutional if possible, the most reasonable reading of the "assistance" provision is that a request for assistance must be made if the official determines that such assistance is "necessary and proper." Second, because neither the Mass Gathering Law nor the Sanitary Code require a permitting official to provide "assistance" to an applicant by, for example, providing police officers as security personnel, it is not true that the Mass Gathering Law and Sanitary Code permits an official to "choose the events" of favored speakers or favored speech "that will receive public assistance" or "veto events by withholding" assistance from disfavored speech or speakers.
 
 
 56
 In relation to this last point, we note once again that a finding of facial constitutionality does not foreclose "as-applied" challenges. In Chicago Park District the Supreme Court was presented with an ordinance which provided grounds on which the Park District "may" deny a permit rather than "must" deny a permit. Chicago Park District, 534 U.S. at 324, 122 S.Ct. 775. The plaintiffs argued that this provision "allow[ed] the Park District to waive the permit requirements for some favored speakers, while insisting upon them for others." Id. The Supreme Court observed that such construction was "certainly not the intent of the ordinance, which the Park District has reasonably interpreted to permit overlooking only those inadequacies that, under the circumstances, do no harm to the policies furthered by the application requirements." Id. at 324-25, 122 S.Ct. 775. The Supreme Court went on to explain that "[g]ranting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional, but we think that this abuse must be dealt with if and when a pattern of unlawful favoritism appears, rather than by insisting upon a degree of rigidity that is found in few legal arrangements." Id. at 325, 122 S.Ct. 775. Similarly, granting public assistance to favored speakers or favored speech in the manner that Field Day complains of would be unconstitutional. Such situations must be dealt with in as-applied challenges if and when they arise.
 
 3. Judicial Review
 
 57
 Finally, Field Day argues that the Mass Gathering Law is unconstitutional in its entirety because it "denies an applicant effective review of the permitting decision." Field Day's argument is premised on the assertion that the statute lacks "objective criteria" on which to base an as-applied challenge. However, as explained in the foregoing, the Mass Gathering Law does provide such criteria. Under Chicago Park District, 534 U.S. at 321-23, 122 S.Ct. 775, because this is a content-neutral, time-place-manner restriction, that is all that is required.
 
 
 58
 Given the foregoing, this Court affirms the District Court's determination that these provisions of the Mass Gathering Law and Sanitary Code are constitutional.
 
 
 59
 V. As-Applied Challenge and Qualified Immunity
 
 A. The Appeal Analyzed
 
 60
 As noted above, Field Day has also asserted an "as-applied" challenge to the actions of Riverhead and Suffolk County, alleging that the actions of Riverhead and Suffolk County employees violated its First Amendment free speech rights. The Suffolk County Employees appeal from the District Court's denial of their motion to dismiss the as-applied claims asserted in Field Day's Second Amended Complaint, pursuant to Fed.R.Civ.P. 12(b)(6). The motion was premised on the Suffolk County Employees' alleged qualified immunity and, as previously discussed, Field Day's alleged lack of standing. Since "as applied" claims depend on the facts of the case at bar, see Wisconsin Right to Life, 126 S.Ct. at 1018, and we are confronted with a facial challenge to the Complaint, we are confined to an examination of the facts set forth in the Complaint. We, like the District Court, "must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." Sheppard v. Beerman, 18 F.3d 147, 150 (2d Cir.1994) (internal quotation marks and citations omitted). Under that standard, we review the facts of this case, as asserted in Field Day's Second Amended Complaint.
 
 1. The Allegations of the Complaint
 
 61
 Field Day "began efforts to promote and produce" the Festival in June 2002. After considering several other locations, its representatives visited Enterprise Park (the "Park"), located within Riverhead, in Suffolk County, New York on November 15, 2002, and soon thereafter notified the Riverhead Town Supervisor that they wanted to lease a portion of the Park for the Festival. On February 20, 2003, Field Day entered into a "License Agreement for Outdoor Event" (the "Agreement") with the Riverhead Community Development Agency (CDA), a public instrumentality of Riverhead.
 
 
 62
 Under the terms of the Agreement, Field Day paid $150,000 to lease roughly 1000 acres of the Park from May 5, 2003, until June 22, 2003, for the purpose of holding the Festival. According to the Agreement, Field Day was "responsible for carrying out and shall have exclusive control of all operations associated with the [Festival] and related activities, including... security for the [Festival] (other than the officials of the Town Police Department which shall be arranged and provided by the CDA)." The Agreement stated that the CDA "shall provide sufficient police protection (including necessary barriers and bike racks); and any necessary road signs for purposes of directing highway and road traffic only." The Agreement also stated in part that Field Day "will secure a `Mass Gathering Permit,'" that such permit is a "Necessary Approval," and that "if [Field Day] is unsuccessful in obtaining the Necessary Approvals ... then this Agreement shall terminate, and the obligations of each party herein shall be null and void."
 
 
 63
 On February 27, 2003, Field Day held a preliminary meeting with officials from Riverhead and the Suffolk County Department of Health Services (SCDHS), including Suffolk County's Bureau of Public Health Protection Chief Bruce Williamson, Suffolk County's "Principal Public Health Sanitarian" Robert Gerdts, SCDHS Deputy Chief of Operations Martin Matuza, Riverhead Chief of Police David Hegermiller, and Riverhead Fire Marshall Bruce Johnson. At this meeting, Field Day gave copies of its mass gathering permit application (the "Permit Application") to Johnson and Matuza and distributed copies of its Preliminary Draft Event Operation Plan, outlining its plans to ensure "adequate and satisfactory" water, sewerage, toilet, refuse, food, and medical facilities, fire protection services, traffic and transportation arrangements, and other "matters relating to security and public safety."
 
 
 64
 On March 12, 2003, Field Day and SCDHS held a "project coordination meeting" to "discuss the scope of the Festival and the process by which Field Day would satisfy aspects of the New York Mass Gathering Law[ ]." The meeting was attended by "representatives from most of the Riverhead and Suffolk County agencies involved with the planning of the Festival," including Suffolk County's Emergency Medical Services, Fire and Rescue Department, and Food Handling Unit, and Riverhead's Fire and Police Departments. At the meeting, Gerdts was authorized by SCDHS to act as "lead agent with respect to the planning of the Festival," and he requested additional copies of Field Day's Application and its Preliminary Draft Event Operation Plan. "At no time did ... Gerdts or any other public official suggest that receipt of Field Day's Permit Application approximately 75 days prior to the proposed date of the Festival was not sufficient time for the SCDHS to process the Permit Application and fulfill any requirements necessary to ensure the timely issuance of the Mass Gathering Permit."
 
 
 65
 On March 21, 2003, SCDHS held a "four-hour permit planning meeting" involving representatives of Field Day, Suffolk County, and Riverhead. Field Day provided Gerdts with the requested copies of its Permit Application and "Preliminary Draft Event Operation Plan" and Gerdts agreed to issue Field Day a "conditional" mass gathering permit by April 25, "pending review of Field Day's submissions on April 21, 2003." On March 24, Field Day received a letter from Gerdts acknowledging receipt of Field Day's Permit Application and indicating that Field Day's "Preliminary Draft Event Operation Plan" was sufficient in scope to allow Field Day to begin advertising the Festival within fifteen days of the date of the letter. In reliance on this letter, Field Day commenced a "massive advertising campaign and spent nearly $200,000 to promote the Festival"; began selling tickets "to fans located all around the country and abroad"; "contracted with bands to ensure their participation"; "hired and made deposits with contractor and production vendors for staging, lights, and sound"; purchased insurance; paid licensing fees; and "entered agreements with labor unions to construct the Festival Site and provide the various guest services that would be required at the Festival."
 
 
 66
 On April 11, 2003, Field Day met with representatives of the Riverhead Police Department, including Chief Hegermiller, the Suffolk County Police Department, and the New York State Police. At this meeting Field Day presented its initial plans for traffic control, transportation, and emergency communication, which it "formulated to conform to Hegermiller's decision to require uniformed police officers inside as well as outside the Event Site." Field Day's representative "walked the attendees through" its "Preliminary Transportation Plan," using a wall map of the site and handouts. Field Day stated that its Permit Application contemplated 60,000 attendees but it expected that it was more likely that only 35,000 to 40,000 people would attend. Field Day also "established a working relationship with the involved agencies in continuing to further develop the plan."
 
 
 67
 That same day, Hegermiller sent a letter to Suffolk County Police Commissioner John Gallagher, with copies to the Riverhead Town Board and the Riverhead Attorney's Office, requesting Gallagher's assistance for several events scheduled to occur at the Park that summer, including the Festival, "the Bonnaroo Music Festival," and the New York Air Show. The letter requested additional police assistance to "fulfill Riverhead's law enforcement and public assistance obligations to Field Day" under the Licensing Agreement, and stated that although Field Day was providing its own on-site security, "preliminary estimates for police personnel [are] around 200, of which Riverhead could possibly supply around 50." Field Day alleges that Hegermiller's request for 150 Suffolk County police officers "was not based on any standards found in the Sanitary Code or requirements under the New York Mass Gathering Laws" and that its provision of private security inside the site meant that the Riverhead Police Department could alone have provided a reasonable number of police officers to control traffic outside the site and to help with security inside the site. Field Day additionally alleges that "[a]lthough Hegermiller estimated that the daily attendance for the Bonnaroo Festival and New York Air Show would be greater than the estimated attendance at Field Day's event, he did not provide specific police deployment numbers for those events." Nevertheless, "relying on both the timing and substance of Hegermiller's representations in connection with Riverhead's desire for additional uniformed public police presence inside the [Park and Festival site], Field Day acquiesced to Hegermiller's recommendation that he request assistance from Suffolk County." According to Field Day, "[a]t no time did Hegermiller or any other public official inform Field Day that [procuring] additional law enforcement assistance from Suffolk County or elsewhere outside Riverhead would create a logistical or timing problem."
 
 
 68
 On April 15, 2003, Suffolk County officials allegedly convened a meeting to discuss "transportation, security, and communications." Field Day alleges that "[i]n addition to participants from previous meetings," this meeting was attended by representatives from the Suffolk County Executive's Office, including Deputy Suffolk County Executive for Public Safety Joe Michaels, and Suffolk County Police Department Sergeant Patrick Maher. Two days later, nearly a month-and-a-half after Field Day provided SCDHS with its Mass Gathering Permit Application and Preliminary Draft Event Operation Plan, SCDHS sent Field Day a letter containing "a detailed list of requirements for a Mass Gathering Permit." A day after that, the New York State Police informed Field Day that they would not participate in the Festival as a result of certain "political issues involving Riverhead and the State Police."
 
 
 69
 On April 22, 2003, Field Day again met with representatives from the Suffolk County and Riverhead Police Departments to "further discuss security, transportation and communication matters." At this meeting, "and in the presence of SCDHS officials," Hegermiller informed Field Day's representative that "SCDHS wanted to charge Field Day a fee of $2.5 million to process its Permit Application, rather than the $4500 fee provided for by the permit application fee determination schedule." Gerdts also allegedly stated that he did not believe in "`trickle-down economics'" and that the Festival had "`no redeeming value'" as far as he was concerned. About one week later, Field Day received an invoice from the Suffolk County Police Department calling for the payment of "time-and-a-half as well as 30% benefits" for 150 police officers at the Festival, estimated by the Department to be a $245,616.00 cost.
 
 
 70
 In addition to the permit application processing fee, Suffolk County and Riverhead also subjected Field Day to "numerous discretionary fees not required by New York Mass Gathering Laws," including $50,000 for "personnel and equipment" from the "Department of Transportation"; $15,000 for the assistance of a local fire department; $17,000 to connect the Festival to the Riverhead water system; and $22,864 per day "for a local hospital to be ready in case of emergencies." According to Field Day, Riverhead's Town Supervisor stated that "Riverhead now felt that it had not charged Field Day enough under the License Agreement and that the water system `connection fee' was being imposed to remedy `some of the difference.'" Field Day also "was asked to re-pave roads leading to and from the entrances to the Festival," a requirement never before imposed for any event held at the Park.
 
 
 71
 On April 30, 2003, Field Day met with representatives from the Suffolk County and Riverhead Police Departments once more to discuss plans relating to traffic and police deployment in greater detail. Field Day presented an updated version of its Transportation Plan and "la[id] out in detail what it believed to be the key traffic control points surrounding the Event Site." In reliance on "representations and discussions held at this meeting," Field Day created a "Traffic Control Point Staffing Spreadsheet" for inclusion into the Transportation Plan.
 
 
 72
 On May 5, 2003, Field Day met yet again with representatives from the Suffolk County and Riverhead Police Departments and discussed the "specific deployment of police officers inside the Event Site." At the conclusion of this meeting, officials from both police departments told Field Day that they would be meeting by themselves on May 8 to finalize the deployment plans and that they would reconvene with Field Day the day after that to discuss the final deployment plan. According to Field Day, "at no time did anybody at this meeting indicate to Field Day that the procurement of law enforcement assistance from Suffolk County or any other entity would not be forthcoming." Likewise,
 
 
 73
 at no time during any of the preceding meetings did the Suffolk County Police Department ever indicate that it would not assist Riverhead with the Festival or that the procurement of that assistance would be a logistical problem. Relying on Defendants' representations at this and prior meetings, Field Day believed that it had satisfied the obligations regarding traffic control, security and communications required to obtain a Mass Gathering Permit from the SCDHS more than 30 days prior to the commencement of the Festival.
 
 
 74
 Unbeknownst to Field Day at that time, throughout April and early May, Clear Channel Entertainment, Inc., by and through its vice-president Ron Delsener, undermined Field Day's efforts to obtain a Mass Gathering Permit for the Festival. The Second Amended Complaint states that Clear Channel Entertainment and its parent company, Clear Channel Communications, Inc., are Field Day's primary competitors in the concert promotion industry and control other Long Island concert venues and that Delsener has contacts with, and political influence over, upper-level public officials in Suffolk County and New York State. Delsener allegedly "sought to enlist the political support of [those] County and State officials and to urge the County to use its authority and political power to prevent [Field Day] from staging the Festival." Specifically, the Complaint alleges that Delsener sent a letter to Suffolk County Executive Robert Gaffney, urging him to prevent the Festival from occurring; telephoned the owner of a golf course near the Park to convince him to oppose the Festival in light of the "massive traffic and security problems" that it would create for his business and other Riverhead residents; and that "a man who said he was from Clear Channel" called a local conservation organization and convinced it to file an (ultimately unsuccessful) motion for an injunction to prohibit the Festival for environmental reasons.
 
 
 75
 On May 9, 2003, Hegermiller called Field Day's "Project Manager" to inform him that the final police deployment meeting scheduled for that day had been cancelled, that "Suffolk County officials were now demanding that the participation of the Suffolk County Police Department could only be effectuated through an inter-municipal agreement between Riverhead and Suffolk County," and that Suffolk County officials said that Suffolk County could not enter into such an agreement without first obtaining the Suffolk County legislature's approval. This was the first time that the issue of an "inter-municipal" agreement had been raised, and Field Day was surprised by this "turnaround" in light of the previous indications by Suffolk County police officials that they would assist Riverhead with the Festival.
 
 
 76
 Despite these new developments, Field Day "was informed that there was still sufficient time" for Riverhead and Suffolk County to enter into the requisite "inter-municipal" agreement and for the Suffolk County legislature to approve it. On the afternoon of May 9, 2003, Field Day's representative met with Deputy Suffolk County Attorney Robert Cabble and SCDHS representatives to "discuss issues that SCHDS felt were under the domain of the Suffolk County Attorney's office." Cabble promised to, but did not, "arrange to obtain the inter-municipal agreement," send it to the Riverhead Town Attorney, and "put Field Day in contact with Suffolk County's Risk Management Department to assure Field Day's compliance with liability insurance and financial certification requirements." Beginning on May 12, 2003, when Field Day still had not received a copy of any inter-municipal agreement or information about any insurance or financial requirements, its local counsel called Cabble "on at least three occasions" to inquire about these issues. Cabble did not return these calls.
 
 
 77
 Field Day then sent its "police liaison and consultant," a former Suffolk County Chief of Police, to meet with Police Commissioner Gallagher. The consultant reported back to Field Day "that Gallagher conceded that the Suffolk County Police Department had refused to participate in the Festival for `political' reasons." The two met again soon after, and Gallagher stated that the deployment of Suffolk County police officers was "completely subject" to Suffolk County Executive Gaffney giving the "political green light."
 
 
 78
 On May 21, 2003, the Riverhead Town Attorney sent Cabble a letter stating that she had been advised that the legislature could hold a special meeting to approve the inter-municipal agreement. The Town Attorney requested that the proposed inter-municipal agreement be forwarded to Riverhead and that arrangements be made for a special meeting of the legislature. Cabble responded by letter the next day (with a copy to Gallagher), stating:
 
 
 79
 At this juncture, it appears that too little time remains to ... hav[e] an approved cooperation agreement in place before the event. Several steps must be taken to do so. First, the actual language of the agreement must be negotiated. Second, the Riverhead Town Counsel must approve the agreement[.] Third, the agreement must be presented to the Suffolk County Legislature for its approval.
 
 
 80
 The letter went on to state that "legislative approval ... is considered to be unlikely" because it would require that a "special meeting ... be noticed and convened by either the County Executive or the Presiding Officer." The Presiding Officer was "out of state," and the County Executive was "declining to convene a special meeting." Moreover, the letter stated that it was "uncertain whether enough legislators to constitute a quorum can be assembled." Even if legislative approval were to occur at all, stated Cabble, it would not be until very close to the date of the Festival, and "there [was] concern that a belated disapproval of the agreement would impair timely notification to ticket holders." In sum, stated Cabble, Suffolk County would not enter into a cooperation agreement to provide police services for the Festival.
 
 
 81
 According to Field Day, however, "contrary to Cabble's representations, the Suffolk County legislature was scheduled to meet on or about June 4th to discuss the re-drawing of the voting districts," and thus, "there was in fact a scheduled meeting of the legislature at which an inter-municipal agreement could have been approved."
 
 
 82
 On May 23, 2003, Gallagher sent formal notice to Hegermiller that Suffolk County would not enter into any agreement to provide police assistance for the Festival. No further explanation was provided. At Gerdt's request, Hegermiller wrote SCDHS to advise it that because of Suffolk's refusal to offer its assistance in implementing Field Day's proposed traffic control plan, he was unable to support the issuance of a mass gathering permit for the Festival. Field Day "again offered to Hegermiller to pay for as many security officers and peace officers, including off-duty police officers and corrections officers, as necessary to satisfy Hegermiller's deployment requirements," but "Hegermiller again refused [Field Day's] offer." On May 27, 2003, Gerdts issued a letter denying Field Day's application for a Mass Gathering Permit in light of its failure to obtain a "statement from the county sheriff, State Police, New York State Department of Transportation or other law enforcement agency certifying that [its] traffic control plan is satisfactory."
 
 
 83
 On May 28, 2003, Field Day responded by letter to Gerdts, noting that his denial of a permit was premature, as "Field Day was continuing to work with the Riverhead Police Department to secure sufficient numbers of police officers and law enforcement personnel that could be employed to effectuate the security and traffic control plans" and "believed that it could nevertheless obtain certification of the traffic control and safety plans prior to the 48-hour deadline provided by the Sanitary Code."
 
 
 84
 On June 4, 2003, Hegermiller informed the Riverhead Town Board that he no longer supported the Festival because of Suffolk County's refusal to provide police assistance. Riverhead then announced that it was withdrawing its support as well and urged Field Day to cancel the event. Riverhead's Supervisor explained that the reason for withdrawal of support was "an unexplained last minute decision" by "upper level County officials" not to participate in the Festival, despite "many months of cooperation and participation in various planning meetings."
 
 
 85
 By the time Field Day received notice of Riverhead's decision, it had sold over 55,000 tickets for the Festival at an average price of $80 per ticket, and had expended more than $3 million to book performers and to promote and stage the Festival. "With fewer than 48 hours before the Festival was to commence, and with thousands of ticket-holders already in route" Field Day was forced to spend "substantial additional sums to secure an alternative venue" in order to mitigate its damages. Field Day was able to secure Giants Stadium (in New Jersey) for a one-day event, which it staged on June 7, 2003 at a loss "in excess of $5 million including lost revenues, advertising costs, costs associated with ... staging the Festival at an alternative venue, and injury to its business reputation, financial standing, and goodwill with artists, ticket buyers, ... and the concert promotion industry." As will be seen, the allegations of the Complaint clearly state a claim upon which relief can be granted for an as-applied challenge to the Mass Gathering Law and its implementing Sanitary Code provisions and do not demonstrate an entitlement to qualified immunity.
 
 2. Qualified Immunity
 
 86
 Below, Suffolk County and its employees (and Riverhead and its employee, though those parties did not appeal) argued that because the Mass Gathering Law is facially constitutional, enforcing it against Field Day was "reasonable per se and entitled [them] to qualified immunity." The Suffolk County Employees also argued that they properly applied the facially constitutional Mass Gathering Law and therefore no constitutional violation occurred. Field Day argued that the Mass Gathering Law was "so `patently unconstitutional' that enforcing it was `objectively unreasonable,'" thereby precluding a defense of qualified immunity. Field Day also argued that the facts of this case precluded the defense of qualified immunity.
 
 
 87
 The District Court first found that "qualified immunity may neither be ruled out per se, nor applied per se, merely because the Defendant enforced the Mass Gathering Law," given that the Mass Gathering Law "cannot be said to reach the level of `blatancy' necessary to per se strip its enforcers of qualified immunity" and because "[i]t seems too obvious to state, but apparently is not, that a constitutional law must be enforced in a constitutional manner; for if the validity of a law was all that mattered, there would be no such thing as an `as applied' challenge." Thus, the District Court turned to the merits of the as-applied challenge, determined that a violation of a constitutional right was clearly pleaded, and that the pleaded facts supported a finding that no reasonable official
 
 
 88
 could have possibly believed that he was acting in a constitutionally permissible fashion by misleading [Field Day] as to the likelihood of, and requirement for, obtaining a mass gathering permit, imposing special impediments on them, and basing the denial of such a permit on a mis-application of the law (namely, requiring certification of traffic plans for contiguous parking facilities).
 
 
 89
 This Court reviews de novo a ruling granting or denying a Rule 12(b)(6) motion. See, e.g., Flaherty v. Lang, 199 F.3d 607, 612 (2d Cir.1999). A public official is entitled to qualified immunity if his actions do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known" or "if it was `objectively reasonable' for [the public official] to believe that his actions were lawful at the time of the challenged act." McClellan v. Smith, 439 F.3d 137, 147 (2d Cir.2006) (internal quotation marks omitted). "[A] qualified immunity defense can be presented in a Rule 12(b)(6) motion, but ... the defense faces a formidable hurdle when advanced on such a motion" and is usually not successful. McKenna, 386 F.3d at 434. Dismissal under Rule 12(b)(6) is only appropriate if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. (internal quotation marks and citation omitted). "In considering a motion to dismiss for failure to state a claim, a district court must limit itself to the facts stated in the complaint, documents attached to the complaint as exhibits and documents incorporated by reference in the complaint." Hayden v. County of Nassau, 180 F.3d 42, 54 (2d Cir.1999).
 
 
 90
 On appeal the Suffolk County Employees argue that Field Day's rights were not clearly established and that their actions were, in any event, not objectively unreasonable. We agree with the District Court: "[B]ased on the allegations in the Complaint, qualified immunity is unavailable at this stage of the proceedings ...."
 
 
 91
 In support of their assertion that no clearly established right has been pleaded in this case, the Suffolk County Employees make two related arguments. First, they argue that the Mass Gathering Law "withstood a constitutional challenge in the New York State Court system," citing Sullivan County v. Filippo, 64 Misc.2d 533, 315 N.Y.S.2d 519 (N.Y.Sup.Ct.1970). Second, citing Vives v. City of New York, 405 F.3d 115 (2d Cir.2005), the Suffolk County Employees argue that because the Mass Gathering Law had never been declared unconstitutional they were entitled to rely on it as presumptively valid, and thus were without "prior notice of an alleged constitutional infirmity." These related arguments suffer from the same defect: They confuse and conflate the facial constitutionality of a statute with the unconstitutional application of that same statute.
 
 
 92
 Vives dealt with a facial challenge to New York Penal Law § 240.30(1), prohibiting "aggravated harassment in the second degree." Id. at 116; see also Vives v. City of New York, 305 F.Supp.2d 289, 301-02 (S.D.N.Y.2003) (holding the statute unconstitutionally overbroad on its face and not discussing the statute as-applied, save as an example of the statute's facial constitutional faults). This Court did observe that
 
 
 93
 absent contrary direction, state officials... are entitled to rely on a presumptively valid state statute ... until and unless [the statute is] declared unconstitutional.... The enactment of a law forecloses speculation by enforcement officers concerning [the law's] constitutionality — with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws.
 
 
 94
 Vives, 405 F.3d at 117 (quoting Connecticut ex rel. Blumenthal v. Crotty, 346 F.3d 84, 102-03 (2d Cir.2003) (alterations in original)). But this was in the context of a facial challenge, not an as-applied challenge to a facially constitutional law, as Field Day is asserting. Vives has no application to the issue presented here.
 
 
 95
 Neither does Filippo have any application to Field Day's as-applied challenge. In Filippo the Supreme Court, Sullivan County, New York, rejected a void-for-vagueness challenge to Public Health Law § 225(5)(o) (former § 225(4)(o)) and part 7 of the Sanitary Code and upheld these provisions as constitutional. Filippo, 64 Misc.2d at 557, 558, 315 N.Y.S.2d 519. Inasmuch as Filippo likewise involved only a facial challenge to the Mass Gathering Law, that case has no application to the as-applied claim before us.
 
 
 96
 Less than two years before the events underlying this action occurred, the Supreme Court reaffirmed that the exercise of discretion granted by a facially constitutional licensing regulation to favor certain speakers over others "would of course be unconstitutional." Chicago Park Dist., 534 U.S. at 325, 122 S.Ct. 775 ("Granting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional."). Just as it is obvious that application of a facially neutral law may violate the equal protection clause, see Yick Wo v. Hopkins, 118 U.S. 356, 373-74, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), so too may the application of a facially neutral law so as to discriminate against certain speakers or ideas violate the First Amendment. In LaTrieste Restaurant and Cabaret Inc. v. Village of Port Chester, 40 F.3d 587 (2d Cir.1994), for example, a topless cabaret filed a § 1983 action, complaining that a municipality and its officers had "den[ied] it equal protection of the laws and interfer[ed] with its First Amendment rights" by selectively enforcing its zoning ordinances in an effort to prevent the cabaret from exercising its First Amendment right to have topless dancing on its premises. Id. at 589, 590-91. This Court held that summary judgment in favor of the defendants was precluded where the cabaret had presented evidence of disparate treatment and, based on comments of the officials, that such treatment was due to animus toward the content of the speech (i.e., the nudity). Id.[5] Indeed, the concern that the government may use facially neutral licensing regulations to engage in content discrimination is the very thing that animates courts to entertain facial challenges to licensing regulations. See City of Lakewood, 486 U.S. at 759, 108 S.Ct. 2138 (explaining that facial challenges are permitted because of "the difficulty of effectively detecting, reviewing, and correcting content-based censorship `as applied' without standards by which to measure the licensor's action"); Rock Against Racism, 491 U.S. at 793, 109 S.Ct. 2746 (noting the necessity of "prevent[ing] city officials from selecting wholly inadequate sound equipment or technicians, or even from varying the volume and quality of sound based on the message being conveyed by the performers"). Like the District Court, we thought it "too obvious to state . . . that a constitutional law must be enforced in a constitutional manner."
 
 
 97
 The Suffolk County Employees also argue that their application of the Mass Gathering Law was objectively reasonable. Under the facts as stated in the Second Amended Complaint, however, that is not so. As set forth above and as found by the District Court, Field Day asserts that various Suffolk County employees "thwarted" Field Day's efforts to obtain a mass gathering permit through "politically motivated, unreasonable, and capricious demands that were imposed under the guise of the Mass Gathering Law, but that were not actually based on its provisions." These demands included a "fee of $2.5 million to process [Field Day's] Permit Application, rather than the $4500 fee provided for by the permit application fee determination schedule" made by SCDHS. Field Day was instructed that it would have to pay $ 245,616.00 to obtain 150 Suffolk County police officers for the Festival. Field Day was also required to obtain an "inter-municipal" agreement in order for Suffolk County to provide those police officers — only to have a Deputy Suffolk County Attorney first delay, then mislead, then rebuff, based on a lack of time, Field Day's efforts to obtain that agreement. All the while, the "Principal Public Health Sanitarian" for SCDHS was asserting that the Festival had "no redeeming value" and various Suffolk County executives were looking to derail the Festival to placate Clear Channel.
 
 
 98
 The Suffolk County Employees argue in their brief that
 
 
 99
 in the case at bar, [Field Day's] [C]omplaint establishes that 200 police were required for .... this event. Moreover, [Field Day's] [C]omplaint establishes that [it] had secured only 50 police for this event at the time the [m]ass [g]athering [p]ermit was denied. Thus, by its own terms, [Field Day's] [C]omplaint establishes that denial of the [m]ass [g]athering [p]ermit was objectively reasonable.
 
 
 100
 Field Day asserts, however, that 200 police officers were not, in fact, needed.
 
 
 101
 Moreover, the letter from Gertz to Field Day rejecting the Application relied only on a misapplication of § 7-1.41 of the Sanitary Code. That letter stated that because Hegemiller did not find the traffic control plan to be satisfactory, ostensibly because fewer than 200 police officers could be provided, Field Day's engineering report had failed to include "a statement from the county sheriff, State police, New York State Department of Transportation or other law enforcement agency certifying that the traffic control plan is satisfactory." See N.Y. Comp.Codes R. & Regs. tit. 10, § 7-1.41(d)(2). However, § 7-1.41(d)(2) makes clear that it applies only to plans "for transportation arrangements from noncontiguous parking facilities to the site." Id. (emphasis added). Field Day's parking facilities were contiguous and, therefore, § 7-1.41(d)(2) clearly did not apply.
 
 
 102
 To the extent that the Suffolk County Employees now invoke other sections of the Sanitary Code to support the denial of the Application, New York law limits this Court's review "to the grounds invoked by the agency." Scherbyn v. Wayne-Finger Lakes Bd. of Co-op. Educ. Servs., 77 N.Y.2d 755, 758 (N.Y. 1991), 570 N.Y.S.2d 474, 573 N.E.2d 562. Furthermore, in accordance with the interpretation of the Mass Gathering Law and Sanitary Code given above, the rejection of the Application based on any other ground would still have to be reasonable, and Field Day has alleged that the rejection was unreasonable.
 
 
 103
 Finally, the Suffolk County Employees raised, for the first time at oral argument, several new contentions, including that Suffolk County had no duty to provide police officers to assist in this event and that, therefore, the refusal of assistance could not be a constitutional violation. "Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal." Norton v. Sam's Club, 145 F.3d 114, 117 (2d Cir. 1998). We note only in passing that the Second Amended Complaint, read fairly, indicates that Field Day could prove that Suffolk County has provided assistance to other events at the Park, including the New York Air Show and the Bonnaroo Music Festival, and that its refusal here was based solely on disapproval of Field Day as speaker or the content of Field Day's speech. Such conduct would, of course, raise serious constitutional concerns. See Chicago Park Dist., 534 U.S. at 325, 122 S.Ct. 775 ("Granting [discretionary] waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional."). However, we do not pass on this issue given the lack of briefing to this Court.[6]
 
 
 104
 Nothing in the Suffolk County Employees's brief to this Court undermines the conclusion of the District Court: "It is ... hard to fathom how any reasonable official in the [Suffolk County Employees'] shoes could have possibly believed that he was acting in a constitutionally permissible fashion." Given the allegations contained in Field Day's Second Amended Complaint, qualified immunity is unavailable on a motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6). Accordingly, the District Court's denial of the Suffolk County Employees's motion to dismiss is affirmed.
 
 CONCLUSION
 
 105
 Accordingly, we reverse so much of the District Court's Order as declares portions of the New York Mass Gathering Law and implementing provisions of the Sanitary Code facially unconstitutional, severs those portions, and grants an injunction against their application. We affirm so much of that Order as declares the remainder of the New York Mass Gathering Law and implementing provisions of the Sanitary Code facially constitutional. We also affirm the Order denying the motion for dismissal of the Complaint premised on lack of standing and qualified immunity.
 
 
 
 Notes:
 
 
 [1]
 The Honorable Laura Taylor Swain of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [2]
 The Supreme Court has recognized that music is speech for purposes of the First Amendment:
 Music is one of the oldest forms of human expression. From Plato's discourse in the Republic to the totalitarian state in our own times, rulers have known its capacity to appeal to the intellect and to the emotions, and have censored musical compositions to serve the needs of the state. The Constitution prohibits any like attempts in our own legal order.
 Rock Against Racism, 491 U.S. at 790, 109 S.Ct. 2746 (internal citations omitted).
 
 
 [3]
 We note that the court inCounty of Sullivan v. Filippo, 64 Misc.2d 533, 315 N.Y.S.2d 519 (N.Y.Sup.Ct.1970) rejected a facial challenge to the Mass Gathering Law on the merits. In that case, the court held that Public Health Law § 225(5)(o) (former § 225(4)(o)) and part 7 of the Sanitary Code were constitutional and did not set forth "vague and indefinite" requirements. Id. at 561-62, 315 N.Y.S.2d 519. While our inquiry does not end with the recognition of Filippo, we are mindful of its value as an authoritative interpretation of the Mass Gathering Law.
 
 
 [4]
 "Whether a given provision in a statute is mandatory or directory is to be determined primarily from the legislative intent gathered from the entire act and the surrounding circumstances, keeping in mind the public policy to be promoted and the results that would follow one or the other conclusion. In this regard, however, it is said that the legislative intent does not depend upon the language in which the intent is clothed, and the fact that a statute is framed in mandatory words such as `shall' or `must', is of slight, if any, importance on the question whether the act is mandatory or directory. Thus mandatory words may be interpreted in a merely permissive sense or vice versa; but where the word `may' appearing in an act was changed to `shall', the court would construe the amendment as being mandatory." N.Y. STAT. § 171 cmt
 
 
 [5]
 The Supreme Court has noted that it "has occasionally fused the First Amendment into the Equal Protection Clause ... but at least with the acknowledgment ... that the First Amendment underlies its analysis."R.A.V. v. City of St. Paul. Minn., 505 U.S. 377, 385 n. 4, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992); see also Police Dept. of City of Chicago v. Mosley, 408 U.S. 92, 96, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) ("Necessarily, then, under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views.").
 
 
 [6]
 Also for the first time at oral argument, the Suffolk County Employees argued that one of the named defendants in this case, Suffolk County Commissioner of Health Brian L. Harper, came to public office only after the events underlying this action and therefore should be dismissed from the case. Harper has been sued only in his official capacity, not in his personal capacity, and has, indeed, been substituted as a named defendant in place of his predecessor in office. That Harper did not hold office at the time of these events is, therefore, of no matterCf. Kentucky v. Graham, 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); Ying Jing Gan v. City of New York, 996 F.2d 522 (2d Cir. 1993).